[No. 28287. Department Two. May 2, 1941.]

ROYAL L. BRAZIER, *a Minor, by Olga H. Brazier, his Guardian ad Litem, Respondent,* v. WESTON J. BETTS, *et al., Appellants.*[1]

*Ballinger, Hutson & Boldt (John W. Blair,* of counsel), for appellants.

*Joseph H. Griffin,* for respondent.

BEALS, J.—Royal L. Brazier, by his guardian *ad litem,* instituted this action against Weston J. Betts and Lauree E. Betts, his wife, and Aubrey King and Mrs. King, alleging that, during the month of March, 1939, while he was lawfully on the premises of de-

[1]Reported in 113 P. (2d) 34.

fendants Betts, the defendant Aubrey King, while in the discharge of his duties as agent and employee of Mr. Betts, assaulted plaintiff by shooting him through both legs, inflicting serious injuries. Plaintiff alleged that the assault was unjustified, and asked for damages for injuries and expenses in a large sum. Defendants King were never served with process, and did not appear in the action.

Defendants Betts answered, denying the material allegations of the complaint, and pleading affirmatively that, at the time of the shooting, King was not acting as agent for defendants Betts, nor was he then acting within the scope of his employment, nor was he engaged in the performance of any of the duties which he had been employed to perform. Plaintiff having replied to the affirmative defense with denials, the action was tried to a jury, which returned a verdict in plaintiff's favor in the sum of one thousand dollars. From a judgment entered upon this verdict, defendants Betts have appealed.

The case is before us upon a short record, appellants presenting only the question of their legal responsibility for King's act in wounding respondent.

Error is assigned upon the denial by the trial court of appellants' challenge to the sufficiency of the evidence, upon the denial of appellants' motion for a directed verdict; and upon the denial of their motion for judgment in their favor notwithstanding the verdict. Error is also assigned upon the refusal of the trial court to enter judgment in appellants' favor, and upon the entry of judgment in favor of respondent.

For some time prior to the month of March, 1939, appellants had operated a resort and roller skating rink at Redondo beach, in King county, where they owned considerable land, using a building, upon the lower floor of which were a bowling alley, pool tables, a

penny arcade, and a lunch counter, all operated by appellants' lessees. The upper floor was used exclusively for roller skating, appellants themselves conducting the rink.

Aubrey King was employed by appellants as floor manager of the roller skating rink, having charge of the skating program while the rink was being used by patrons, it being also his duty to see that those present maintained good order. King had been in appellants' employ since April, 1937. During the daytime, he cleaned the rink, that work requiring about three hours a day. The skating rink was open from seven-thirty to ten-thirty every night, save Fridays and Saturdays, when it remained open until twelve-thirty. It does not appear that King had any duties to perform during the night, after the rink closed. As part of his compensation, King was allowed the use of an apartment in the southeast corner of the building, another employee occupying an adjoining room. King was also furnished with light and water for use in the apartment, but was not furnished wood for use as fuel. It appears that, on occasions when patrons of the skating rink had caused some disturbance there and had left the premises, King followed such persons downstairs and outside the building, in order to see that they did not loiter around the premises and cause further annoyance.

Appellants owned the ground upon which the building was situated and considerable surrounding land, including a few cottages in the immediate vicinity of the main building. They also owned a small house located about nine hundred and sixty feet in a northeasterly direction from the rink. March 1, 1939, appellants rented the house referred to, to three boys who were attending a nearby high school. Appellants did not agree to supply these boys with electric cur-

rent or wood for their stove. The rental was $7.50 per month, which included running water. The lease was to run for only a short period.

On the night of the shooting, King quit work at midnight, and locked the skating rink. King testified, his testimony being corroborated and not contradicted, that he bought his own firewood, and that, not long prior to March 1st, he had purchased a load of mill wood from a fuel dealer in Tacoma, who had delivered the wood near King's quarters in the rink building. There was some wood nearby, belonging to appellants.

On the evening of March 3, 1939, respondent, then fifteen years of age, with several of his schoolmates having attended a basketball game, with his friends paid a visit to the three boys who had rented appellants' cottage, it having been previously agreed that after the game a lunch would be served. The wood which the boys had procured for their stove proved to be too long, so respondent and four other boys, with an automobile truck driven by John Olson, started off to procure better fuel. This was between three and three-thirty o'clock a. m. The boys proceeded with the truck to the skating rink, stopping it beside the pile of mill wood belonging to King, that pile of wood lying about ten feet from the entrance to King's apartment.

Some of the boys then commenced to throw some of King's mill wood onto the truck. Respondent was not assisting in loading the wood, but was standing on the running board beside the cab, endeavoring to turn on the car radio. King, who had retired for the night, though still awake, hearing the noise, went outside and saw the boys loading his wood on their truck. There is some dispute in the evidence as to just what King said, but, in any event, he, having armed himself with a revolver, fired three shots, as he testified, aiming at the

tires of the truck. The second shot passed through respondent's legs above the knees, inflicting serious wounds.

Respondent testified that, after the boys had been throwing mill wood on the truck for two, three, or four minutes, he heard someone ask, in quite vigorous language, what they were doing, and that, immediately after the inquiry, three shots were fired, the second of which struck respondent, stunning him so that he remembered little else that happened. Respondent later became a patient in Harborview hospital, Seattle, where he remained ten days, his wounds requiring treatment for about two months thereafter. Respondent testified that, at the time of the shooting, the truck was standing still, and that the moon was shining very brightly.

King's testimony concerning the facts surrounding the shooting differed greatly from the story told by respondent's witnesses, but, for the purpose of this opinion, we accept respondent's testimony as to what happened.

The record contains nothing which in any manner contradicts or questions the evidence introduced on behalf of appellants to the effect that they had not agreed to furnish wood for use in the house occupied by the boys, and that the pile of mill wood from which the boys were helping themselves at the time of the shooting was bought and paid for by King, for his personal use in the apartment which he occupied.

As to the duties which King was hired to perform, Donald Hoggatt, who had for five years been employed in the bowling alley above referred to, testified that, on occasions when some patrons of the skating rink had created a disturbance, and by request left the rink, King would sometimes follow the disturbers downstairs to see that they did not loiter around the prem-

ises; that the last time he saw such an occurrence King went as far as the first floor porch, fifteen to twenty-five feet from the stairway leading upstairs to the rink.

The evidence discloses that, some time prior to the shooting, Mr. Betts, with his employee King, called at the office of the sheriff of King county, and aided King in procuring a "peace officer's commission," which, as testified by the deputy sheriff who interviewed Messrs. Betts and King, and caused the commission to be issued, gave King "the right to carry a gun and no other right whatever, so the printed card states." The evidence shows that King had suggested to his employer that some commission from the sheriff would help him in maintaining order around the premises, and that Mr. Betts interested himself in the matter, went with King to the sheriff's office, and told the sheriff's deputy in charge that the issuance of a commission to King would aid the latter in controlling rowdies who might visit the rink and cause some unpleasantness, which would result in loss of patronage. It clearly appears that Mr. Betts participated in the procurement of this commission, feeling that it would be of assistance in the maintenance of order in the skating rink.

Assuming that King was not justified in opening fire upon the truck and its occupants, in the manner in which the evidence introduced by respondent indicates that he did, the question to be determined is: Does the record support the jury's finding that King, at the time and in doing what he did, was in the course, or within the scope, of his employment, and furthering any purpose of appellants?

The record contains no evidence even suggesting that appellants in any way participated in the acts which resulted in respondent's injuries, that they ever expressly authorized King's acts, or that appellants ratified such acts thereafter. Neither does the record

show that King had previously exercised his authority, such as it was, in an arbitrary or oppressive manner, to the injury of anyone.

We have before us testimony of the following witnesses: respondent Royal L. Brazier, Donald Hoggatt, John A. Scougal, the deputy sheriff who issued the commission to King, and appellant Weston J. Betts, who was called as a witness by respondent. Of appellants' witnesses, the record contains the testimony of Aubrey L. King and Mr. Betts, who testified on his own behalf.

In the case of *Estes v. Brewster Cigar Co.,* 156 Wash. 465, 287 Pac. 36, the plaintiff sued the defendant named and its employee, M. G. Daymude, alleging that the latter, who was in charge of a cigar store operated by Brewster Cigar Co., when plaintiff left the store without paying a wager upon a dice game, raised a hue and cry against the plaintiff, which resulted in the latter being shot by a police officer. The plaintiff appealed from an order dismissing the action upon sustaining a demurrer to his complaint, and this court, while affirming the order of dismissal as to the Cigar Co., reversed the order as to Daymude. Concerning the liability of the employer, the court said:

"If therefore the respondent is to be held liable for the acts, it must be so held under the doctrine of *respondeat superior*—the doctrine that holds a master responsible for the acts of his servant when the servant acts in the furtherance of his master's business, and within the scope of the servant's employment.

"As we have before noted, the appellant did not wrongfully carry away or wrongfully attempt to carry away any property of the master, nor had he committed any other offense against the master's property, and no business of the master could be furthered by his arrest. Nor could his arrest be said to be in vindication of public justice; he had committed no offense, and had he been arrested, he must have been dis-

charged as soon as the actual facts were made known. The act of the servant must thus have been in the furtherance of some purpose of his own, rather than the furtherance of some purpose of the master, and the rule is general that, when a servant acts for purposes of his own, not for the purposes of his master, and thereby causes an injury to another, the act is not within the scope of his employment and the master cannot be held liable therefor."

Upon the record in the case at bar, it must be held that the wood which respondent's companions were loading upon the truck belonged to King, that appellants had no interest therein, and that, at the time of the shooting, shortly after three o'clock in the morning, King was performing no duties within the scope of his employment as floor manager and general overseer of the skating rink. He was appellants' employee, paid by the week, and receiving as part of his compensation, and for his own use, quarters in a building owned by appellants. It is, of course, admitted that the wounding of respondent occurred on appellants' property. It does not, however, appear that King ever performed any duties or services as night watchman or guard anywhere on appellants' premises.

Respondent relies upon several authorities, which we shall now consider. In *Matsuda v. Hammond*, 77 Wash. 120, 137 Pac. 328, 51 L. R. A. (N. S.) 920, it appeared that one Bell, who was in charge of a produce commission business, owned by Jennie H. Hammond, left his place of business and went to a market stall operated by the plaintiff, where he accused plaintiff of the theft of a crate of strawberries, and demanded payment therefor, under threat of arrest. An altercation occurred, during which Bell struck plaintiff in the face. In an action brought by the plaintiff against Mrs. Hammond and Bell, judgment was rendered against both of them. On appeal, the judgment against

Bell was affirmed, the judgment as against Mrs. Hammond being reversed. Respondent relies upon the following paragraph of the opinion:

"The cases cited holding an employer liable for the acts of an agent employed to retake articles sold on conditional bills of sale, which have not been paid for according to the contract of sale, are not so easily distinguished on principle. The liability seems to be made to rest on the peculiar character of the employment, which, from its nature, is liable to create disputes and consequent breaches of the peace. But without specially reviewing the cases, we think they may be regarded as exceptions to the general rule announced, rather than as establishing a contrary rule."

Respondent argues that the position of an agent employed to retake articles sold on conditional sale is analogous to the position occupied by King in his relationship to appellants, and that King's employment falls within the class referred to as one "which, from its nature, is liable to create disputes and consequent breaches of the peace." The opinion calls attention to the fact that the class of employment referred to constitutes an exception to the general rule, and the scope of the employment of King, as disclosed by the evidence, does not fall within the class referred to in the *Matsuda* case. One employed to retake articles sold under conditional sale contract, in that employment assumes from the beginning an antagonistic attitude to those with whom he deals.

On the contrary, King's general employment as floor manager of the skating rink required courtesy and consideration toward patrons of the rink, in order to build up good will for appellants' benefit. True, King was to maintain order in the rink, and had, at appellants' request, received a peace officer's commission, to assist him in maintaining order. It does not appear

that this commission gave him any more authority upon appellants' premises than he would have had without the commission, but of course display of his badge would give King a moral strength which would tend to enable him to maintain order without the use of force. The commission did give King authority to carry a pistol, but it does not appear that he ever did so, or even that appellants knew that he owned one, although Mr. Betts testified that he knew King had in his possession a .22 rifle. We are convinced that King's employment was not in any way similar in character to the class of employees referred to in that portion of the *Matsuda* case relied upon by respondent.

The case of *Johanson v. Pioneer Fuel Co.*, 72 Minn. 405, 75 N. W. 719, is cited by this court in the *Matsuda* case. In the *Johanson* case, the supreme court of Minnesota, affirming an order sustaining a demurrer to the complaint, said:

"And the test of liability of the master depends upon the question whether the injury was committed by the authority of the master, expressly conferred or fairly implied from the nature of the employment, and the duties incident to it. [Wood, Mast. & Serv.] Id. 535. We hold that the assault by McKee upon plaintiff was an independent tort, for which the Pioneer Fuel Company was in no way liable, that the bald statement in the complaint that it was done by the servant while in the course of his employment is not, taken in connection with the other facts stated in the complaint, sufficient to charge the master."

In the case of *De Leon v. Doyhof Fish Products Co.*, 104 Wash. 337, 176 Pac. 355, in which a judgment against the master, in favor of an employee, based upon an assault upon the latter by the master's superintendent, was affirmed, it was held that the superintendent had general power to maintain discipline, within the bounds of his own discretion, and that the

employer was liable for an abuse of that power. The assault upon the employee was malicious, and it appeared that the relationship of the parties was such that the employer was liable for the wrongful act of the superintendent. It also appeared that the assault took place in the company store, during the usual hours of labor.

In the case of *Nolan v. Fisher Co.*, 172 Wash. 267, 19 P. (2d) 937, the employer was held liable for an assault committed by its store manager upon the manager of a concession occupying under lease a portion of the premises, the store exercising some control over contract sales by the lessee. In this case also, the assault was committed in the defendant's store, during business hours. The subject matter of the dispute which resulted in the assault was connected with the business relations of the store and the lessee.

In the case of *McQueen v. People's Store Co.*, 97 Wash. 387, 166 Pac. 626, it was held that the owner of a department store was not liable for the act of the driver of one of its delivery trucks in inviting girls to ride a short distance on the running board of the truck, one of the girls while riding having been injured through the negligence of the driver. In the course of the opinion, we said:

"While no decisive test can be given for determining whether or not a given act is within the scope of a servant's employment, it is apparent from all the authorities that the act complained of must have been done while the servant was engaged in doing some act under authority from his master; not that, while engaged in the act, he is employed in the master's business; but the act must have been in the furtherance of the master's business and such as may be fairly said to have been either expressly or impliedly authorized by the master."

It was held that, in inviting the girls to ride upon the truck, the driver was furthering his own pleasure

and not his master's business, his employment being to drive the truck.

In the recent case of *Poundstone v. Whitney,* 189 Wash. 494, 65 P. (2d) 1261, the master was held liable for the negligence of his shop employee, who had been authorized to drive the master's automobile in a parade, the employee having gone out of his way to take a prospective customer to participate in the parade. On his way to pick up the prospect, the employee negligently injured third parties, to whom the master was held liable. The employees had been instructed to be on the lookout for prospective customers. The rule applicable to the facts is stated as follows:

"Whether an employee, at the time the act was done for which the employer was sought to be held liable, was within the scope of his employment, depends upon whether the act had been expressly or impliedly authorized by the employer. In addition to this, the employer is liable if the act complained of was incidental to the acts expressly or impliedly authorized or indirectly contributed to the furtherance of the business of the employer."

At the time the injuries were inflicted, the employee was actually driving the master's car in an endeavor to further the master's business interests. It was held that he was performing an act which, while unauthorized, was merely incidental to the act he was authorized to perform, and which would indirectly contribute to the furtherance of the interests of his employer.

In the case of *Forsberg v. Tevis,* 191 Wash. 355, 71 P. (2d) 358, an employer was held liable for the negligence of his employee, driving the employer's truck, as the employee testified, for the purpose of soliciting business for the employer. The employee's duty was to drive the truck, collect and deliver laundry, and solicit business. The question of the employer's lia-

bility, upon the facts shown, was clearly for the jury. The court quoted a portion of the following statement from 1 Restatement of the Law of Agency, 530, § 236:

"The fact that the predominant motive of the servant is to benefit himself or a third person does not prevent the act from being within the scope of employment. If the purpose of serving the master's business actuates the servant to any appreciable extent, the master is subject to liability if the act otherwise is within the service, as where the servant drives rapidly, partly to deliver his master's goods, but chiefly in order that he may terminate his day's work or to return the vehicle to the master's premises."

In the Restatement, under the heading "Scope of Employment," 505, § 228, the general statement reads as follows:

"(1) Conduct of a servant is within the scope of employment if, but only if:

"(a) it is of the kind he is employed to perform . . .

"(b) it occurs substantially within the authorized time and space limits . . .

"(c) it is actuated, at least in part, by a purpose to serve the master."

The rules applicable to situations such as that here presented may be stated with comparative ease; the difficulty occurs in determining whether or not certain specific facts fall within or without the rule. In the case at bar, there is little dispute in the material evidence, and, of course, after verdict and judgment, respondent's version as to disputed facts is accepted. We have consequently disregarded Mr. King's testimony as to what happened at the time of the shooting.

Respondent argues that King was employed by appellants for the purpose of preserving order on the latter's premises. The evidence does not support such a broad statement. It was a portion of King's duties to keep order in and about the skating rink, but there

is nothing in the record which even tends to show that King was charged with the duty of preserving order throughout all of appellant's premises, or at all during the hours that the skating rink was closed. We fail to find any basis in the evidence for a finding that, at times or places other than those referred to, it was within the scope of King's employment to preserve order. After the patrons had departed and the skating rink was locked, the relationship existing between King and appellants was simply that of an employee living on the premises, in quarters furnished him as part of his compensation.

Appellants cite the case of *Frisell v. Surry*, 107 Wash. 662, 182 Pac. 604, in which employers were held not to be liable for the act of a special watchman in the employ of an agency which protected the property of its patrons, the watchman, then on duty in the course of his employment, having left his beat and the property of his employers, and, in aid of a police officer of the city, engaged in the pursuit of persons said to have committed an assault. While engaged in the chase, the watchman shot and killed the minor son of the plaintiff, who apparently had not been guilty of any offense. The lower court granted a nonsuit, and on appeal the judgment of dismissal was affirmed. This court called attention to the fact that the watchman stepped outside the scope of his employment, left his beat, and entered upon a chase in which his patrons were nowise concerned. In affirming the judgment, this court said:

"Clearly these facts, and all reasonable inferences which may be drawn therefrom, all point to one conclusion, and reasonable men cannot differ as to that conclusion. Hence there was no question to be submitted to the jury, and the court may here say, as a matter of law, that Gouley was not acting within the scope of his employment when he fired the fatal shot."

In the recent case of *Van Court v. Lodge Cab Co.,* 198 Wash. 530, 89 P. (2d) 206, the plaintiffs sued the defendant for damages sustained while riding in a taxicab owned by the defendant. The action was tried to the court, and from a judgment entered in favor of plaintiffs, the defendant appealed. This court reversed the judgment, holding that plaintiffs' own evidence and all reasonable inferences to be drawn therefrom showed that, at the time of the injuries, the taxicab was not being operated in the course of the owner's business, but was being used by the driver and a companion and the plaintiffs themselves, in an expedition of their own.

In the case of *Sullivan v. Associated Dealers,* 4 Wn. (2d) 352, 103 P. (2d) 489, this court reversed a judgment in plaintiff's favor, entered upon the verdict of a jury. Plaintiff was injured as the result of a collision between the automobile in which she was riding and one belonging to the defendant, driven by one Ramberg. It appeared that Ramberg was in the defendant's employ, but that his employment ceased at nine o'clock in the evening. The collision occurred shortly after one o'clock in the morning, and this court, after considering several questions, was of the opinion that, upon the record, it should be held as matter of law that, at the time of the accident, Ramberg was not acting within the scope of his employment and was not in any way furthering his master's interests.

In 39 C. J. 1296, § 1490, the rule is stated as follows:

"Act committed by servant when off duty. If the act resulting in the injury is committed by the servant at a time when he is off duty, as for instance, after the day's work is completed, or at the noon hour, or where the servant has been given a holiday, the master will not be liable therefor; and it has been held that this is so, although the act is one which, if done by the servant while on duty and at a time when actually

engaged in the master's service, would be within the course and scope of his usual and ordinary duties."

In 1 Restatement of the Law of Agency, 520, § 233, is found the following:

"Time of Service. Conduct of a servant is within the scope of employment only during a period which is not unreasonably disconnected from the authorized period."

Upon the facts, and in view of the law applicable thereto, we find in the record neither evidence nor any reasonable inference that could be drawn from the evidence, which supports the finding of the jury in respondent's favor. King's day's work was over. Assuming that he used too much force, to respondent's injury, King was protecting his own property, to-wit: his pile of firewood, not the property of appellants. He was neither acting within the scope of his employment nor in any manner furthering the interests of his employers. The fact that he held a commission of a sort from the sheriff of King county, which commission was issued at appellant's request, does not alter the situation in any manner. That fact has no bearing upon the situation as disclosed by the record.

The trial court erred in overruling appellants' motion for judgment in their favor notwithstanding the verdict, and the judgment appealed from is reversed, with instructions to dismiss the action.

ROBINSON, C. J., MILLARD, JEFFERS, and SIMPSON, JJ., concur.