**Joye N. PIERSON, Individually and as Administratrix of the Estate of Douglas J. Pierson, Deceased, Plaintiff-Appellant,**

v.

**UNITED STATES of America, Defendant-Appellee.**

**No. 72–2786.**

United States Court of Appeals, Ninth Circuit.

Dec. 4, 1975.

---

Elvin J. Vandeberg, Kane, Vandeberg & Hartinger, Tacoma, Wash., for plaintiff-appellant.

Bruce D. Carter, Asst. U. S. Atty., Seattle, Wash., for defendant-appellee.

## OPINION

Before KOELSCH and SNEED, Circuit Judges, and FIRTH,* District Judge.

SNEED, Circuit Judge:

This case comes to us on an appeal from an order of the district court granting the motion of the United States for summary judgment against Mrs. Pierson in her suit under the Federal Tort Claims Act, 28 U.S.C. § 1346 (1970). Our jurisdiction rests on 28 U.S.C. § 1291 (1970). The district court held that as a matter of law the facts before it did not support a cause of action under the Federal Tort Claims Act and dismissed Mrs. Pierson's suit. This constitutes error. We reverse and remand for further proceedings consistent with this opinion.

## I.

### Facts.

The facts are somewhat unusual. In brief, plaintiff's husband, Douglas Pierson, was killed in the crash of a United States Army aircraft on August 6, 1969 in the State of Washington. Mr. Pierson was then employed as a biologist by the State of Washington and was involved in radio-tracking elk on the Olympic Peninsula. We assume, without deciding, that this endeavor, although partially federally funded, was for all relevant purposes a state project.

■ In the early part of August 1969, Dr. Wendell Dodge, a United States Department of the Interior research biologist working for the Bureau of Sport Fisheries and Wildlife, made a request of Major Leo Schmitz, the standardization and training officer at Gray Army Air Field in Washington, for the use of a military aircraft. The aircraft was to be used in radio-tracking porcupines in the same general area where Pierson was radio-tracking elk. Major Schmitz obtained approval for this request from Dodge's supervisors, but not from his own, and authorized the use of a military aircraft in the project. It is undisputed that such authorization violated a number of Department of the Army and Department of Defense regulations. It will be assumed that Major Schmitz had no actual authority to authorize the flight, although apparently he did not realize this.

One porcupine tracking mission was flown on August 4, 1969. A second had been planned for August 8, but was changed to August 6 upon Pierson's request to Dodge to allow the plane to be used for the state elk tracking project. The rescheduling was apparently done without the knowledge of Major Schmitz. During the August 6 flight the aircraft crashed, killing all three occupants: the Army pilot (Captain Jerry Vick), Pierson, and a telemetry expert who was employed by Mr. Dodge's agency. The flight request forms filled out by the pilot for the fatal flight misidentified the passengers as Department of the Army civilians ["D/A Civ."]. There is no evidence as to whether the pilot was aware that this was incorrect or that Pierson knew about the misidentification.

The Government in its brief offers three arguments to support an affirmance of the grant of summary judgment. The first argument turns on the apparent authority of Major Schmitz to authorize the use of military aircraft by employees of a state agency. The second is that the pilot of the aircraft, Captain Vick, was not within the scope of his employment. The final argument is that an allegation of gross negligence is required under the law of Washington when a guest is injured in an aircraft. After disposing of certain preliminary matters we will discuss each of these arguments in turn.

---

* Honorable Robert Firth, United States District Judge, Central District of California, sitting by designation.

## II.

### Preliminary Matters.

We note at the outset that this case is governed by the law of the State of Washington. *Williams v. United States,* 350 U.S. 857, 76 S.Ct. 100, 100 L.Ed. 761 (1955). Cases cited by counsel involving somewhat similar fact situations in states other than Washington clearly are not controlling and to the extent that the law of other states differs from that of Washington, they generally are not persuasive. Thus *United States v. Alexander,* 234 F.2d 861 (4th Cir. 1956), the only authority cited by the district court, which turns on the Indiana law of *respondeat superior,* provides little assistance in the analysis of this case. Further, since this case comes before us on a motion for summary judgment the United States has the burden of showing that there is no issue as to any material fact and "in ruling on the motion all inferences of fact from the proofs proffered at the hearing must be drawn against the movant and in favor of the party opposing the motion." 6 Moore's Federal Practice and Procedure, ¶ 56.15[3]; *Griffeth v. Utah Power & Light Co.,* 226 F.2d 661, 669 (9th Cir. 1955). The fact that plaintiff has submitted no affidavits controverting those of the defendant does not change defendant's burden or the way in which inferences will be drawn. Moore's, *supra* at ¶ 56.23.

## III.

### Apparent Authority.

The Government argues that Major Schmitz had no apparent authority because he had no actual authority and because the United States had taken no action which could induce Pierson to believe that there was authority in Schmitz to allow a state employee to use the aircraft for an official state project not related to military affairs. The leading Washington case on apparent authority holds that the apparent authority of an agent can only be inferred from acts of the principal and not from acts of the agent. *Lamb v. General Associates, Inc.,* 60 Wash.2d 623, 374 P.2d 677 (1962). *Lamb* goes on to state that:

> [t]he burden of establishing agency rests upon one who asserts it. Facts and circumstances are sufficient to establish apparent authority only when a person exercising ordinary prudence, acting in good faith and conversant with business practices and customs, would be misled thereby, and such person has given due regard to such other circumstances as would cause a person of ordinary prudence to make further inquiry. [citation omitted].
>
> A principal may be estopped to deny that his agent possesses the authority he assumes to exercise, where the principal knowingly causes or permits him so to act as to justify a third person of ordinary careful and prudent business habits to believe that he possesses the authority exercised, and avails himself of the benefit of the agent's acts. [citation omitted]. *Id.* at 627–28, 374 P.2d at 680.

The question here, then, is whether under this state law standard the United States established that no issue of material fact as to apparent authority exists and no inference from the facts is possible which would establish apparent authority.

The actions of the principal upon which an inference of apparent authority can be based need not be explicit individual communications to the party alleging apparent authority. In *Walker v. Pacific Mobile Homes, Inc.,* 68 Wash.2d 347, 413 P.2d 3 (1966) the question was the apparent authority of a mobile home salesman to take a consignment of the plaintiff's trailer on behalf of his employer in a situation in which it was clear that there was no actual authority. In finding apparent authority the Washington Supreme Court relied on the general appearance of authority which the dealer had given the salesman by placing him on a lot labeled with the dealer's name in circumstances where there was no reason for an ordinary man of prudence to believe that the salesman did

not have full power to deal in trailers—including the power to take consignments. There had been no specific representation made by the dealer with respect to consignments.[1] In the case before us, Major Schmitz did have actual authority over the assignment and use of the aircraft which crashed when it was used for normal military training operations. Pierson knew that Schmitz had allowed Dodge to use an aircraft. According to the affidavit of Schmitz, his superiors knew of this use and did not prohibit it (C.T. at 188). The fact of the flight on August 4 and the failure to prohibit future flights is conduct by the principal (the U. S.) which would tend to establish that Schmitz had apparent authority to authorize *non-Department of Defense federal employees* to use military aircraft for a plainly non-military purpose. Hence, the issue narrows to the question of whether a reasonable and prudent man would have seen the difference between being a *non-Department of Defense federal employee* and a *state government employee* as important to the authority of Major Schmitz to allow the aircraft to be used. We cannot say that this distinction between Pierson and Dodge was enough to negate the apparent authority of Schmitz as a matter of law. The programs the two men were working on were very similar. The line between Defense Department employees and all other government employees seems to us to be, on its face, at least as significant as the federal/non-federal line. Pierson had good reason to believe the former line was not a restriction on Schmitz power. He had no good reason to think that the latter distinction was a restriction on Schmitz.[2]

Pierson apparently had no contact with Schmitz. He worked through Dodge who in turn contacted the Army for the rescheduling of the flight. If Pierson knew that Schmitz was not contacted, or had reason to believe that he was not, then the apparent authority of Schmitz is irrelevant. However, this is a factual question which cannot be resolved on the present record.

1. "The salesman's solitary presence in the company office and about the lot on several occasions, among numerous trailers on display, beneath a sign conspicuously proclaiming the whole to be an enterprise of Pacific Mobile Homes, Inc., and his towing plaintiff's trailer to the trailer lot and putting it on display there, allowed a person of ordinary business prudence to reasonably assume that the salesman had authority from Pacific Mobile Homes, Inc. to buy, sell, receive and deliver trailers for cash, on credit, consignment or in exchange. Then, too, the salesman's untrammeled access to and use of his principal's letterhead, stationery and business forms, and his seeming control of the office and lot, fortify the idea of apparent authority." 68 Wash.2d at 350–51, 413 P.2d at 5.

2. The Washington cases cited by the Government involving unauthorized passengers are clearly distinguishable from this case. All three involved instances in which plaintiff was invited by an employee of defendant to ride on a part of a vehicle plainly and obviously not designed to transport passengers. The Washington Supreme Court, without using the label, dealt with the cases in terms of the plaintiff assuming the risk of riding in an obviously unsafe place. *McQueen v. People's Store Co.,* 97 Wash. 387, 166 P. 626 (1917) (woman invited to ride on running board of truck); *Gruber v. Cater Transfer Co.,* 96 Wash. 544, 165 P. 491 (1917) (plaintiff invited to ride on back of moving truck); *Fischer v. Columbia & P. S. R. R.,* 52 Wash. 462, 100 P. 1005 (1909) (plaintiff invited to ride on locomotive engine). No such issue is presented in this case.

Section 242 of the Restatement (Second) of Agency (1957) cited by the Government, simply is not dispositive of the case. Section 242 states:

A master is not subject to liability for the conduct of a servant towards a person harmed as the result of accepting or soliciting from the servant an invitation, *not binding upon the master,* to enter or remain upon the master's premises or vehicle, although the conduct which immediately causes the harm is within the scope of the servant's employment. (emphasis supplied).

The italicized phrase states a premise which is the very question at issue. The comments to this section state that it applies to a servant who "without authority or apparent authority to do so, permits or invites persons to ride on [the master's vehicle]." In this case apparent authority is an issue, not an assumption.

## IV.

### *Scope of Employment.*

 Even if there were apparent authority on the part of Major Schmitz, summary judgment would be appropriate if it could be said on this record that, as a matter of law, the Army pilot, Captain Vick, was not within the scope of his employment. The Federal Tort Claims Act imposes liability on the Government for the acts of its servants only when they are acting within the scope of their employment.[3] In *Brazier v. Betts*, 8 Wash.2d 549, 113 P.2d 34 (1941) Washington has adopted § 228 of the Restatement (Second) of Agency with regard to the scope of employment which says, in pertinent part, that:

> (1) Conduct of a servant is within the scope of employment if, but only if:
>
> (a) it is of the kind he is employed to perform;
>
> (b) it occurs substantially within the authorized time and space limits;
>
> (c) it is actuated, at least in part, by a purpose to serve the master . . .

Vick's flight arguably falls within the scope of § 228. It was the kind of work he was hired to perform—flying. There is no evidence that it was not done during duty hours and in the area Schmitz had approved. Finally, on this record it cannot be said as a matter of law that Vick's purpose was not at all to fulfill his duties as an Army pilot.

The fact that he identified the passengers on the fatal flight as Department of the Army civilians does not establish that Vick's motive was not to serve his master. It is at least possible that he was misinformed or that he filled the report out in the standard way he would for a military mission, but still believed that all the passengers were authorized. He labeled the telemetry expert, Paul Martin, who was a federal employee as a "D/A civilian". Vick had previously received explicit authorization to take him up on the August 4 flight. There would seem to have been no necessity to "cover-up" his identity and hence we cannot accept the Government's assertion that Vick clearly knew he was without authority to make the flight.[4]

 But even if he knew Pierson was not authorized, Washington case law clearly indicates that an act done in violation of an express prohibition of the master can be within the scope of the servant's employment "where such an act was done in conjunction with other acts which were within the scope of the duties an employee has been instructed to perform." *Smith v. Leber*, 34 Wash.2d 611, 209 P.2d 297 (1949); *accord, Greene v. St. Paul-Mercury Indemnity Co.*, 51 Wash.2d 569, 320 P.2d 311 (1958). Thus, even if Vick had no motivation to serve the Government in taking Pierson up, Martin was on the flight in order to test new tracking equipment. Given the authorization by Schmitz of the previous flight, it is certainly arguable that Vick as "actuated, at least in part, by a purpose to serve the master" in making the flight.

## V.

### *Duty of Care Owed to Guests in Aircraft.*

---

**3.** 28 U.S.C. § 1346(b) states that the district courts:

> . . . shall have exclusive jurisdiction of civil actions on claims against the United States . . . for . . . personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government *while acting within the scope of his office or employment,* under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place

where the act or omission occurred. (Emphasis supplied).

**4.** It should be noted further that the aircraft disposition form filled out by Vick clearly states that the Bureau of Fish and Wildlife is the requesting organization. Although it lists Martin and Pierson as "D/A Civ.", it also lists their organization as the Bureau of Fish and Wildlife. Vick made no distinction on the form between Martin and Pierson, thus suggesting the possibility that he was not aware of Pierson's status.

Finally there is the question of whether an allegation of gross negligence is required where a guest in an aircraft is injured. The Government relies on *Saxe v. Terry,* 140 Wash. 503, 250 P. 27 (1926) in which the Washington Supreme Court adopted a common law rule that a host is only liable to a guest for gross negligence. In addition, we note that Washington has a guest statute, RCW 46.08.-080. However, we have found no case applying either *Saxe* or the statute to guests in aircraft. Other states, moreover, have uniformly failed to apply their guest statutes to aircraft. . *See, e. g., Walthew v. Davis,* 201 Va. 557, 111 S.E.2d 784 (1960); *Gridley v. Cardenas,* 3 Wis.2d 623, 89 N.W.2d 286 (1958); *In re Hayden's Estate,* 174 Kan. 140, 254 P.2d 813 (1953); *Hanson v. Lewis,* 11 Ohio Op. 42, 26 Ohio L.Abst. 105 (C.P.1937). The Washington Supreme Court has indicated that its guest statute is to be construed strictly. *Brown v. Gamble,* 60 Wash.2d 376, 374 P.2d 151 (1962). The authorities do not indicate conclusively that an allegation of gross negligence is required. However, even if it is so required the plaintiff should be permitted to amend her complaint. It appears that she sought to so amend her complaint but her motion was not considered by the trial judge, perhaps because it did not bear on the grounds given in support of the grant of summary judgment. The motion should have been granted if Washington law requires an allegation of gross negligence. We pass no judgment at this time on whether Washington law requires a showing of gross negligence under the circumstances of this case. The trial court should be permitted to address itself to this issue before we intervene.

In short, we find none of the arguments put forth for summary judgment convincing. The Order is reversed and the cause remanded.

Reversed and remanded.