# ROSS J. HUNTER ET AL. *v.* BOARD OF EDUCATION OF MONTGOMERY COUNTY ET AL.

[No. 32, September Term, 1981.]

*Decided January 7, 1982.*

The cause was argued before MURPHY, C. J., and SMITH, DIGGES, ELDRIDGE, COLE, DAVIDSON and RODOWSKY, JJ.

*Browne L. Kooken,* with whom were *Charles A. Dukes, Jr.* and *Dukes & Kooken* on the brief, for appellants.

*Amicus curiae* brief of the Board of Education of Baltimore County filed. *Leonard S. Jacobson, County Solicitor, Arnold Jablon, Assistant County Solicitor, William B. Somerville* and *Smith, Somerville & Case, John H. Mudd, H. Thomas Howell, Susan T. Preston, Nora Winay* and *Semmes, Bowen & Semmes* on the brief.

*Paul V. McCormick,* with whom were *McCormick, Sullivan & Talbott* on the brief, for appellees.

DIGGES, J., delivered the opinion of the Court. DAVIDSON, J., concurs in part and dissents in part, and filed an opinion at page 491 *infra,* concurring in part and dissenting in part.

This case primarily presents the troubling but nevertheless important question, which has not been previously addressed by this Court, of whether an action can be successfully asserted against a school board and various individual employees for improperly evaluating, placing or teaching a student. The Circuit Court for Montgomery County (Shearin, J.) and the Court of Special Appeals [1] concluded that an educational negligence action could not be maintained. We agree with this determination and will affirm that portion of the judgment, but will reverse with respect to petitioners' allegations concerning the commission of an intentional tort by certain individual employees of the board.

As this case is before us on appeal from an order sustaining a demurrer without leave to amend, in accord with familiar principles, we take as true all well pleaded material facts as well as all inferences reasonably based upon them.[2] The Hunters filed this six count declaration on behalf of their child, Ross, naming as defendants the Montgomery County School Board as a corporate body, the principal of Hungerford Elementary School where young Hunter received his primary education, a board employee who engaged in diagnostic testing of the student in second grade, and the boy's sixth grade teacher at Hungerford. The action was instituted in October, 1977, shortly after Ross' sixteenth birthday. As best we can gather from the declaration, the parents (petitioners here) complain that the school system negligently evaluated the child's learning abilities and caused him to repeat first grade materials while being physically placed in the second grade. It is

---

1. Hunter v. Bd. of Ed. of Montgomery County, 47 Md. App. 709, 425 A.2d 681 (1981).

2. See Hoffman v. Key Fed. Sav. & Loan, 286 Md. 28, 33-34, 416 A.2d 1265, 1268 (1979); Arnold v. Carafides, 282 Md. 375, 382, 384 A.2d 729, 733 (1978).

alleged that this misplacement, which continued at least through grade school, generally caused the student to feel "embarrassment," to develop "learning deficiencies," and to experience "depletion of ego strength." The petitioners further claim that the individual educators, acting intentionally and maliciously, furnished false information to them concerning the student's learning disability, altered school records to cover up their actions, and demeaned the child.

It is clear, however, that the gravamen of petitioners' claim in this case sounds in negligence, asserting damages for the alleged failure of the school system to properly educate young Hunter, and we first focus our attention on this aspect of it. In so doing, we note that these so-called "educational malpractice" claims have been unanimously rejected by those few jurisdictions considering the topic. See *D.S.W. v. Fairbanks No. Star Bor. Sch. Dist.,* 628 P.2d 554 (Alaska 1981); *Smith v. Alameda Cty. Soc. Serv. Agency,* 90 Cal.App.3d 929, 153 Cal. Rptr. 712 (1979); *Peter W. v. San Francisco Unified School District,* 60 Cal.App.3d 814, 131 Cal. Rptr. 854 (1976); *Hoffman v. Board of Ed. of City of N.Y.,* 49 N.Y.2d 121, 424 N.Y.S.2d 376, 400 N.E.2d 317 (1979); *Donohue v. Copiague Union Free School Dist.,* 47 N.Y.2d 440, 418 N.Y.S.2d 375, 391 N.E.2d 1352 (1979). These decisions generally hold that a cause of action seeking damages for acts of negligence in the educational process is precluded by considerations of public policy, among them being the absence of a workable rule of care against which the defendant's conduct may be measured, the inherent uncertainty in determining the cause and nature of any damages, and the extreme burden which would be imposed on the already strained resources of the public school system to say nothing of those of the judiciary. Thus, in *Peter W., supra,* where a high school graduate sought recovery in tort for a claimed inadequate education, the California court, viewing the problem as whether an actionable duty of care existed, noted that the "wrongful conduct and injuries allegedly involved in educational malfeasance" were neither

comprehensible nor assessable within the judicial framework and explained as follows:

> Unlike the activity of the highway or the marketplace, classroom methodology affords no readily acceptable standards of care, or cause, or injury. The science of pedagogy itself is fraught with different and conflicting theories of how or what a child should be taught, and any layman might — and commonly does — have his own emphatic views on the subject. The "injury" claimed here is plaintiff's inability to read and write. Substantial professional authority attests that the achievement of literacy in the schools, or its failure, is influenced by a host of factors which affect the pupil subjectively, from outside the formal teaching process, and beyond the control of its ministers. They may be physical, neurological, emotional, cultural, environmental; they may be present but not perceived, recognized but not identified.
>
> We find in this situation no conceivable "workability of a rule of care" against which defendants' alleged conduct may be measured . . . no reasonable "degree of certainty that . . . plaintiff suffered injury" within the meaning of the law of negligence. . . ., and no such perceptible "connection between the defendant's conduct and the injury suffered," as alleged, which would establish a causal link between them within the same meaning. [60 Cal.App.3d at 824-25, 131 Cal. Reptr. at 860-61 (citations omitted).]

Although the just-articulated policy considerations alone sufficed to negate a legal duty of care in *Peter W.,* the court aptly identified additional, practical consequences of imposing such a duty upon the persons and agencies who administer our public educational system:

> Few of our institutions, if any, have aroused the controversies, or incurred the public dissatisfaction, which have attended the operation of the public

schools during the last few decades. Rightly or wrongly, but widely, they are charged with outright failure in the achievement of their educational objectives; according to some critics, they bear responsibility for many of the social and moral problems of our society at large. Their public plight in these respects is attested in the daily media, in bitter governing board elections, in wholesale rejections of school bond proposals, and in survey upon survey. To hold them to an actionable "duty of care," in the discharge of their academic functions, would expose them to the tort claims — real or imagined — of disaffected students and parents in countless numbers. They are already beset by social and financial problems which have gone to major litigations, but for which no permanent solution has yet appeared. . . . The ultimate consequences, in terms of public time and money, would burden them — and society — beyond calculation. [60 Cal.App.3d at 825, 131 Cal. Reptr. at 861 (citation omitted).]

In *Donohue v. Copiague Union Free School Dist., supra,* the New York Court of Appeals addressed the identical proposition as that presented in *Peter W.,* but viewed the issue as presenting solely a question of public policy:

The fact that a complaint alleging "educational malpractice" might on the pleadings state a cause of action within traditional notions of tort law does not, however, require that it be sustained. The heart of the matter is whether, assuming that such a cause of action may be stated, the courts should, as a matter of public policy, entertain such claims. We believe they should not. [391 N.E.2d at 1354.]

The New York court concluded that the action should not be permitted because to do so would "constitute blatant interference with the responsibility for the administration of the public school system lodged by [State] Constitution and statute in school administrative agencies." 391 N.E.2d at 1354.

Two subsequent cases, presenting somewhat more appealing circumstances, provided the respective New York and California courts the opportunity to revisit and strengthen the *Donohue* and *Peter W.* decisions. In *Hoffman v. Board of Ed. of City of N.Y.,* 49 N.Y.2d 121, 424 N.Y.S.2d 376, 400 N.E.2d 317 (1979), the plaintiff, who was of normal intelligence, was negligently placed in special classes for the mentally retarded where he remained for over ten years. The New York Court of Appeals reversed the Appellate Division, which had allowed recovery, and declared that "[t]he policy considerations which prompted our decision in *Donohue* apply with equal force to 'educational malpractice' actions based upon allegations of educational misfeasance and nonfeasance." 400 N.E.2d at 320.[3] Likewise, in *Smith v. Alameda Cty. Soc. Serv. Agency,* 90 Cal.App.3d 929, 153 Cal. Reptr. 712 (1979), the plaintiff alleged that the school district negligently placed him in classes for the mentally handicapped under circumstances where the district either knew or should have known that he was not retarded. Declaring that the duty sought to be imposed in *Smith* was basically "indistinguishable from the one argued for in *Peter W.,*" the court held that no cause of action was stated against the school district. 153 Cal. Reptr. at 719. See also *D.S.W. v. Fairbanks No. Star Bor. Sch. Dist.,* 628 P.2d 554 (Alaska 1981) (following the California and New York decisions, the court held that there exists no cause of action for negligent failure to diagnose dyslexia and termination of remedial classes).

We find ourselves in substantial agreement with the reasoning employed by the courts in *Peter W.* and *Donohue,* for an award of money damages, in our view, represents a singularly inappropriate remedy for asserted errors in the educational process.[4] The misgivings expressed in these

---

3. The intermediate New York court characterized the school board's failure to detect the placement error through retesting as an "affirmative act" of negligence, which was actionable, and distinguished it from an educational malpractice action based upon negligent failure to instruct properly a student. 64 A.D.2d 369, 410 N.Y.S.2d 99, 109 (1978).

4. We do not pass here on the question of whether this case indicates a bar to an action against other professionals, normally subject to suit, merely

cases concerning the establishment of legal cause and the inherent immeasurability of damages that is involved in such educational negligence actions against the school systems are indeed well founded. Moreover, to allow petitioners' asserted negligence claims to proceed would in effect position the courts of this State as overseers of both the day-to-day operation of our educational process as well as the formulation of its governing policies. This responsibility we are loath to impose on our courts. Such matters have been properly entrusted by the General Assembly to the State Department of Education and the local school boards who are invested with authority over them. See Md. Code (1978 & 1981 Cum. Supp.), §§ 2-106, 2-205, 2-303, 4-101, 4-107, 4-110, 4-204 and 4-304 of the Educational Article which broadly delineates the supervisory responsibility of the State Department of Education, the local school boards, and their respective superintendents. In this regard, we have stated in another context, that "the totality of the various statutory provisions concerning the State Board [of Education] 'quite plainly ... invests the ... Board with the last word on any matter concerning educational policy or the administration of the system of public education.'" *Resetar v. State Bd. of Education,* 284 Md. 537, 556, 399 A.2d 225, 235 (1979).

Our conclusion on this point, however, does not imply that parents who feel aggrieved by an action of public educators affecting their child are without recourse. For example: (1) the General Assembly has provided a comprehensive scheme for reviewing a placement decision of a handicapped child including an appeal to the circuit court, Md. Code (1978, 1981 Cum. Supp.) § 8-415 of the Education Article; (2) both parent and child have the right to review educational records and, if appropriate, insist that the documents be amended, COMAR 13A.08.02.01 *et seq.;* (3) section 4-205(c) (3) of the Education Article commands that each county

because they are employed by the educational system. As this is not an issue presented by the allegations here, we leave its resolution to an appropriate case.

superintendent, "without charge to the parties concerned . . . shall decide all controversies that involve: (i) [t]he rules and regulations of the county board; and (ii) [t]he proper administration of the county public school system," with the decision being appealable to the county board and then to the state board of education, § 4-205 (c) (4), and further, if appropriate, to the courts through the administrative procedure act, Md. Code (1957, 1978 Repl. Vol. & 1981 Cum. Supp.), Art. 41, §§ 255, 256; and (4) county boards of educa-, tion are required to establish "at least one" citizen committee "to advise the board and to facilitate its activities and programs in the public schools," and similar committees may be established for an individual school. § 4-111. Thus, it is preferable, in the legislature's view, to settle disputes concerning classification and placement of students and the like by resorting to these and similar informal measures than through the *post hoc* remedy of a civil action. With this we have no quarrel, for, as aptly noted by the Alaska Supreme Court in this regard, "[p]rompt administrative and judicial review may correct erroneous action in time so that any educational shortcomings suffered by a student may be corrected. Money damages, on the other hand, are a poor, and only tenuously related, substitute for a proper education." *D.S.W. v. Fairbanks No. Star Bor. Sch. Dist., supra,* 628 P.2d at 557. Consequently, we will affirm the judgment of the Court of Special Appeals concerning the dismissal of counts I, III, IV, V and VI of petitioners' amended declaration.[5] This leaves the claim set forth in count II to which we now address our attention.

---

**5.** Although the declaration contains six counts, there are, in essence, only three theories presented — negligence, breach of contract, and intentional infliction of injury. Count II presents petitioners' intentional tort claims and count V incorporates prior allegations and asserts breach of an "implied contract." Counts I, III, and VI expressly state negligence claims against the Board or the individual respondents, while count IV alleges breach of a statutory duty to "provide the minor plaintiff with quality education." The same considerations which act to preclude a damage claim founded on common law for educational negligence will likewise preclude a claim based upon the various educational statutes. Statutory claims similar to that presented here in count IV were rejected in D.S.W. v. Fairbanks No. Star Bor. Sch. Dist., 628 P.2d 554, 556 (Alaska 1981); Peter W. v. San

Count II represents the parents' somewhat amorphous claim that the respondents intentionally and maliciously acted to injure their child. Research reveals that none of the prior cases discussing educational malpractice have squarely confronted the question of whether public educators may be held responsible for their intentional torts arising in the educational context.[6] In declining to entertain the educational negligence and breach of contract actions, we in no way intend to shield individual educators from liability for their intentional torts. It is our view that where an individual engaged in the educational process is shown to have wilfully and maliciously injured a child entrusted to his educational care, such outrageous conduct greatly outweighs any public policy considerations which would otherwise preclude liability so as to authorize recovery.[7] It may well be true that a claimant will usually face a formidable burden in attempting to produce adequate evidence to establish the intent requirement of the tort, but that factor alone cannot prevent a plaintiff from instituting

---

Francisco Unified School District, 60 Cal.App.3d 814, 826-27, 131 Cal. Reptr. 854, 862 (1976), and Donohue v. Copiague Union Free School Dist., 64 A.D.2d 29, 407 N.Y.S.2d 874, 880-81, aff'd 47 N.Y.2d 440, 418 N.Y.S.2d 375, 391 N.E.2d 1352 (1979). With respect to the contract claim asserted in count V, what we have said in this opinion concerning the uncertainty of damages, the difficulty in determining legal cause, and the public policy factors precluding negligence claims remains true whether the allegations state breach of contract or tort and we discuss it no further. Smith v. Alameda Cty. Soc. Serv. Agency, 90 Cal.App.3d 929, 943, 153 Cal. Reptr. 712, 719 (1979). The remaining claim, count II, we discuss in the text *infra*.

6. In *Peter W.,* the California court dismissed plaintiffs' claim of intentional misrepresentation for lack of specificity after plaintiffs failed to amend their complaint. In *Donohue* and *Hoffman,* however, the New York Court of Appeals did imply in dicta that liability might exist for those charged with educational responsibility where their actions constituted "gross violations of defined public policy." Hoffman v. Board of Ed. of City of N.Y., 49 N.Y.2d 121, 424 N.Y.S.2d 376, 400 N.E.2d 317, 320 (1979); Donohue v. Copiague Union Free School Dist., 47 N.Y.2d 440, 418 N.Y.S.2d 375, 391 N.E.2d 1352, 1354 (1979).

7. This is not the first time that this Court has recognized suits based on malicious or outrageous conduct in areas where public policy generally precludes liability. *See* Lusby v. Lusby, 283 Md. 334, 352, 390 A.2d 77, 85-86 (1978) (interspousal immunity not applied to intentional and outrageous acts); Mahnke v. Moore, 197 Md. 61, 68, 77 A.2d 923, 926 (1951) (parent-child immunity abrogated for malicious and wanton wrongs).

the action.[8] Thus, the petitioners are entitled to make such an attempt here.

> *Judgment of the Court of Special Appeals affirmed in part and reversed in part and case remanded to that Court for the entry of a judgment in accordance with this opinion.*
> *Costs to be divided equally between the parties.*

*Davidson, J., concurring and dissenting:*

I agree with the majority that individuals engaged in the educational process who intentionally injure a child entrusted to their educational care should be held liable.

---

8. We note that petitioners do not allege that any individual members of the school board acted intentionally and maliciously toward young Hunter. Under the doctrine of *respondeat superior,* the Board can only be held liable for the intentional torts of its employees committed while acting within the scope of their employment. Lepore v. Gulf Oil Corp., 237 Md. 591, 595, 207 A.2d 451, 453 (1965); Tea Company v. Roch, 160 Md. 189, 192, 153 A. 22, 23 (1931); Western Union Tel. Co. v. Rasche, 130 Md. 126, 130, 99 A. 991, 993 (1917); Consolidated Ry. Co. v. Pierce, 89 Md. 495, 502, 43 A. 940, 941-42 (1899). An intentional tort is within the scope of employment where it is carried out in furtherance of the master's business or is intended in part for the master's benefit. Lepore v. Gulf Oil Corp., *supra,* 237 Md. at 595, 207 A.2d at 453; Tea Company v. Roch, *supra,* 160 Md. at 192, 153 A. at 23; Evans v. Davidson, 53 Md. 245, 249 (1880). See also 2 F. Harper & F. James, *The Law of Torts,* § 26.9 at 1391 (1956); W. Prosser, *Law of Torts* § 70 at 464 (4th ed. 1971); 1 Restatement (Second) Agency, § 235, comment a, at 520 (1958); accord Park Transfer Co. v. Lumbermens Mut. Casualty Co., 142 F.2d 100 (1944); Averill v. Luttrell, 44 Tenn.App. 56, 311 S.W.2d 812, 814 (1957); Cary v. Hotel Rueger, 195 Va. 980, 81 S.E.2d 421, 424 (1954); Brazier v. Betts, 8 Wash.2d 549, 113 P.2d 34, 39 (1941); Linden v. City Car. Co., 239 Wis. 236, 300 N.W. 925, 926 (1941). Where, as here, it is alleged that the individual educators have wilfully and maliciously acted to injure a student enrolled in a public school, such actions can never be considered to have been done in furtherance of the beneficent purposes of the educational system. Since such alleged intentional torts constitute an abandonment of employment, the Board is absolved of liability for these purported acts of its individual employees. Consequently, we are not called upon here to consider whether or to what extent the board has another defense available to it under the doctrine of governmental immunity. See, however, Md. Code (1978 & 1981 Cum. Supp.), § 4-105 of the Education Article which waives governmental immunity to a limited extent.

Accordingly, I agree with the majority's holding that petitioners are entitled to maintain an action against the individual defendants for the intentional injuries alleged.

I do not agree with the majority, however, that individuals engaged in the educational process who, through professional malpractice, negligently injure a child entrusted to their educational care should not be held liable. In my view a cause of action against such individuals should exist for such negligent injuries. Accordingly, I respectfully dissent from the majority's holding that the petitioners here are not entitled to maintain an action against the individual defendants for the negligent injuries alleged.

As long ago as 1889 in *Cochrane v. Little,* 71 Md. 323, 331-32, 18 A. 698, 700-01 (1889), Chief Judge Alvey stated the following with respect to actions against lawyers for their negligent acts:

> "Apart from any mere special or technical objections, the declaration would seem to contain all the averments essential to entitle the plaintiffs to maintain their action. This is best shown by a brief statement of the principles upon which the action is maintainable. It is now well settled by many decisions of courts of high authority, both of England and of this country, that every client employing an attorney has a right to the exercise, on the part of the attorney, of ordinary care and diligence in the execution of the business intrusted to him, and to a fair average degree of professional skill and knowledge; and if the attorney has not as much of these qualities as he ought to possess, and which, by holding himself out for employment he impliedly represents himself as possessing, or if, having them, he has neglected to employ them, the law makes him responsible for the loss or damage which has accrued to his client from their deficiency or failure of application. Or, as said by Lord Chancellor Cottenham, in delivering the opinion in *Hart v. Frame,* 6 Cl. & Fin. 193, 209, a client who has

employed an attorney has a right to his diligence, his knowledge, and his skill; and whether he had not so much of these qualities as he was bound to have, or having them, neglected to employ them, the law properly makes him liable for the loss which has accrued to his employer. And in another part of the same opinion the learned Chancellor said: Professional men, possessed of a reasonable portion of information and skill, according to the duties they undertake to perform, and exercising what they so possess with reasonable care and diligence in the affairs of their employers, certainly ought not to be held liable for errors in judgment, whether in matters of law or discretion. Every case, therefore, ought to depend upon its own peculiar circumstances; and when an injury has been sustained which could not have arisen except from the want of such reasonable skill and diligence, or the absence of the employment of either on the part of the attorney, the law holds him liable. In undertaking the client's business, he undertakes for the existence and for the due employment of these qualities, and receives the price of them. Such is the principle of the law of England, and that of Scotland does not vary from it. . . ."

\* \* \*

". . . In the course of the trial several exceptions were taken by the defendant to rulings of the court. The first two of these were taken to the admissibility of the testimony of lawyers, examined by the plaintiffs, for the purpose of proving to the jury, that, in their opinion, the advice given by the defendant to Korns, under the facts and circumstances proved by other witnesses in the case, was not such as a prudent, careful lawyer, of ordinary capacity and intelligence, would have given, or ought to have given. As we understand it, this was not an

attempt on the part of the plaintiffs to prove to the jury by the lawyers, that the abstract principle involved in the advice given by the defendant was not law, for that would have been an usurpation of the functions of the court; but simply that the advice, in view of all the circumstances and conditions under which it was given, was not such as a prudent, careful lawyer, of ordinary capacity, would have given. Such testimony, in this class of cases, is allowed, as furnishing aid to the jury, in considering the question of negligence or want of skill. There are many cases in which such testimony has been received, but it is not deemed necessary to refer to more than *Godefroy v. Dalton,* 6 Bing. 460; *Hunter v. Caldwell,* 10 Q. B. 69; *Swinfen v. Chelmsford,* 5 Hurl. & N. 890, 897. There was therefore no error in the rulings on these exceptions."

As recently as 1975 in *Raitt v. Johns Hopkins Hospital,* 274 Md. 489, 498-99, 336 A.2d 90, 95 (1975), Judge Levine stated the following with respect to the nature of the duty of care and the standard of care applicable in actions against physicians for their negligent acts:

". . . in *Dashiell v. Griffith,* 84 Md. 363, 380-81, 35 A. 1094 (1896), our predecessors stated: '. . . The cases are generally agreed upon the proposition, that the amount of care, skill and diligence required is not the highest or greatest, but only such as is ordinarily exercised by *others in the profession generally. . . .'* (emphasis added). There had been a hint of this standard in *State, use of Janney v. Housekeeper,* 70 Md. 162, 172, 16 A. 382 (1889), where this Court held that '. . . the degree of care and skill required is that reasonable degree of care and skill which physicians and surgeons ordinarily exercise in the treatment of their patients. . . .'

"This rule, which makes no reference whatever to the defendant-physician's community, was consis-

tently followed prior to 1962. *See, e.g., Lane v. Calvert,* 215 Md. 457, 462, 138 A.2d 902 (1958) (standard of care 'such as is ordinarily exercised by others in the profession generally.'); *McClees v. Cohen,* 158 Md. 60, 66, 148 A. 124 (1930). Indeed, it has been quoted occasionally even since 1962, *Nolan v. Dillon,* 261 Md. 516, 534, 276 A.2d 36 (1971) (standard of care 'such as is ordinarily exercised by others in the profession generally.'); *Anderson v. Johns Hopkins Hosp.,* 260 Md. 348, 350, 272 A.2d 372 (1971) ('. . . the standard of skill and care ordinarily exercised by surgeons in cases of this kind. . . .'); *Johns Hopkins Hospital v. Genda,* 255 Md. 616, 620, 258 A.2d 595 (1969) ('. . . the standard of skill and care ordinarily exercised by surgeons in cases of this kind . . . .')."

Thus, this Court has consistently recognized, notwithstanding the existence of a myriad of intangibles, a multiplicity of unknown quantities and a variety of other uncertainties attendant in any profession, that a professional owes a duty of care to a person receiving professional services; that a standard of care based upon customary conduct is appropriate; and that it is possible to maintain a viable tort action against a professional for professional malpractice. Finally, as recently as 1979, in *Vance v. Vance,* 286 Md. 490, 408 A.2d 728 (1979), this Court has recognized that under certain circumstances there can be recovery for mental or emotional distress resulting from non-intentional negligent acts. The application of all of these principles to this case leads me to the conclusion that there should be a viable cause of action on the facts alleged here.

In my view, public educators are professionals. They have special training and state certification is a prerequisite to their employment. They hold themselves out as possessing certain skills and knowledge not shared by noneducators. As a result, people who utilize their services have a right to expect them to use that skill and knowledge with some minimum degree of competence. In addition, like other profes-

sionals, they must often make educated judgments in applying their knowledge to specific individual needs. As professionals, they owe a professional duty of care to children who receive their services and a standard of care based upon customary conduct is appropriate. There can be no question that negligent conduct on the part of a public educator may damage a child by inflicting psychological damage and emotional distress. Moreover, from the fact that public educators purport to teach it follows that some causal relationship may exist between the conduct of a teacher and the failure of a child to learn. Thus, it should be possible to maintain a viable tort action against such professionals for educational malpractice.

Here the declaration alleges, in pertinent part, that the individual defendants "owed a duty to the minor plaintiff to comport themselves within the standards of their profession, and to exercise that degree of care and skill ordinarily exercised by those similarly situated in the profession; . . ." The declaration further alleges that the defendants breached that duty by, among other things, placing the child in the second grade and requiring him to repeat first grade materials even though he had satisfactorily completed these materials in his first year in school, subsequently placing him in a grade ahead of the material he was actually studying, testing the child so incompletely and inadequately as to result in total failure of evaluation of the problems, and insulting and demeaning the child in private and public. Finally, the declaration alleges that the defendants' acts in breach of their duties were the proximate cause of injuries to the child which included, among other things, substantial learning deficiencies, psychological damage and emotional stress. This declaration alleges that the defendants owed a professional duty to the child to act in conformity with an appropriate standard of care based upon customary conduct, that there was a breach of that duty, and that unforeseeable injuries were proximately caused by that breach. Manifestly, it states a cause of action that comports with traditional notions of tort law.

Unlike my colleagues, I believe that public policy does not prohibit such claims from being entertained. It is common knowledge, and indeed the majority recognizes, that the failure of schools to achieve educational objectives has reached massive proportions. It is widely recognized that, as a result, not only are many persons deprived of the learning that both materially and spiritually enhances life, but also that society as a whole is beset by social and moral problems. These changed circumstances mandate a change in the common law. New and effective remedies must be devised if the law is to remain vital and viable.

Moreover, I do not agree with my colleagues that adequate internal administrative procedures designed for the achievement of educational goals are available within the educational system. In my view none of the available procedures adequately deal with incompetent teaching or provide adequate relief to an injured student. A cause of action for educational malpractice meets these social and individual needs.

In addition, I do not agree with the majority that recognition of such a cause of action will result in a flood of litigation imposing an impossible burden on the public educational system and the courts. Similar arguments appearing in cases that recognized the constitutional rights of students have not been validated by subsequent empirical evidence. *See Goss v. Lopez,* 419 U.S. 565, 600 n.22 (1975) (Powell, J., dissenting).

Finally, I do not agree with the majority that the recognition of such a cause of action "would in effect position the courts of this State as overseers of both the day-to-day operation of our educational process as well as the formulation of its governing policies", roles that have been "properly entrusted by the General Assembly to the State Department of Education and the local school boards." That the Legislature has delegated authority to administer a particular area to certain administrative agencies should not preclude judicial responsiveness to individuals injured by unqualified administrative functioning. In recognizing a cause of action for educational malpractice, this Court would do nothing

more than what courts have traditionally done from time immemorial — namely provide a remedy to a person harmed by the negligent act of another. Our children deserve nothing less.