DANIEL HOFFMAN, Respondent, v BOARD OF EDUCATION OF THE CITY OF NEW YORK, Appellant.

Second Department, November 6, 1978

### APPEARANCES OF COUNSEL

*Allen G. Schwartz, Corporation Counsel (Bernard Burstein* and *L. Kevin Sheridan* of counsel), for appellant.

*Pazer & Epstein (Perry Pazer* and *Helen B. Stoller* of counsel), for respondent.

### OPINION OF THE COURT

SHAPIRO, J.

This is an appeal from a judgment of the Supreme Court, Queens County, which is in favor of the plaintiff, upon a jury verdict, in the principal amount of $750,000. For the reasons hereafter stated, the judgment should be reversed and a new trial granted, unless plaintiff stipulates to accept to reduce the principal amount of the verdict to $500,000.

Shortly after starting kindergarten in September, 1956, plaintiff was placed in a class for Children with Retarded Mental Development (CRMD) based upon a determination by defendant's certified psychologist that the child had an intelligence quotient (I.Q.) of 74. *Seventy-five was the cut-off point fixed by the defendant, so that if plaintiff had been given a rating of 75 he would not have been found to be retarded and would not have been sent to a class for mentally retarded children. He remained in classes for the retarded for 11 years,* until he was 17 years of age. At that age he was transferred to the Occupational Training Center for the retarded. He re-

mained there for one year; at the start of the second year, in September, 1969, he was advised that he would not be continued there because an I.Q. test administered in May, 1969 showed that he was not retarded.

## THE FACTS

Plaintiff was born in April, 1951. He lived with his parents, an older sister and his paternal grandmother in Ridgewood, Queens. His father died when plaintiff was 13 months old. His mother became the breadwinner; she went to work as a bottle washer for Pfizer and Co., leaving the plaintiff in his grandmother's care during her working hours.

Before his father's death, plaintiff had started talking and walking. He retrogressed after his father's death; for a while he stopped both walking and talking. His speech was still not normal at the time of the trial.

In February, 1956, when plaintiff was 4 years and 10 months old, his mother took him to the National Hospital for Speech Disorders. The hospital's records noted that plaintiff was "a friendly child with little or no intelligible speech. Produces infantile equivalents for names of some objects—or will vocalize in imitations of inflection * * * Appears to be retarded and should have psychological [sic]." It also noted: "Mongoloid eyes, otherwise no Mongoloid features". The stated "impression" was "borderline Mongolism". Plaintiff, in fact, was not a Mongoloid child. The notation of "Mongoloid eyes" apparently referred to the fact that the angles on each side of his eyes formed by the junction of the upper and lower lids were somewhat greater than is usual among occidental children. Also, he had unusually large ears, a characteristic he had inherited from his mother.[1]

One month later, on March 5, 1956, a nonverbal intelligence test known as the Merrill-Palmer Test was administered to plaintiff by a psychologist employed by the same hospital. *Plaintiff scored an I.Q. of 90, with a mental age of 4 years and 5 months, as against his actual age of 4 years and 11 months. This was within the range of normal intelligence.* The "inter-

---

1. As testified by Dr. Lawrence Kaplan, there is no such thing as "borderline Mongoloid". Down's syndrome (popularly known as Mongoloidism) is associated with a variable constellation of stigmata, caused by chromosomal abnormality; as stated in Stedman's Medical Dictionary (4th Lawyers' ed, 1976, p 1382), "no single physical sign is diagnostic and most stigmata are found in some normal persons"; one of these is *small* ears.

pretation" included the note that "his range—particularly whenever form perception and problem-solving acuity are involved—indicates that he can work well into the average and even brighter range. Shows some over-dependent and restrictive characteristics, but eventually manages to adjust * * * Performance suggests organic dysfunction in speech expressive area, since he generally appears to understand well & respond as well as able to questions & directions." Pursuant to the follow-up recommendation, plaintiff's mother took plaintiff to the New York Speech Institute for weekly therapy for some period of time and, apparently, until after plaintiff's placement in his first CRMD class.

Plaintiff entered kindergarten at his neighborhood school, Public School 81, Queens, in September, 1956. Four months later, on January 9, 1957, Monroe Gottsegen, a certified clinical psychologist who started his employment with defendant about a week earlier, administered the primarily verbal Standford-Binet Intelligence Test. At that time, Dr. Gottsegen had had his Master's degree for six years, during which period he had tested about 1,000 children. His report, dated January 23, 1957, included the following:

"Mongolian tendencies, severe speech defects, slow in response.

*"Recommendation:*

"Eligible for placement in a CRMD class at P 77 Q in September 1957. * * *

"Danny impresses as a shy, cooperative youngster. *Mongoloid features are observable.*[2] There is a marked speech defect which makes Danny hesitant in speaking up. He obviously understands more than he is able to communicate. With careful listening, it is frequently possible to understand what he is driving at.

"On the Stanford-Binet, L, he achieves a mental age of 4-3 and an I.Q. of 74, indicating borderline intelligence. The obtained I.Q. may be higher than it ought to be as the Examiner was confronted with the task of having to interpret what Danny was trying to say, Danny being given the benefit of the doubt when it seemed reasonable to do so.

"Danny is frequently bored in class and needs a specialized individualized teaching program. At this point, a continued,

---

2. In this respect Dr. Gottsegen's report makes the same error that had been made in the earlier report of the National Hospital for Speech Disorders.

yet varied readiness program should be offered him. He is not yet able to do formal learning. He needs help with his speech problem in order that he be able to learn to make himself understood. *Also his intelligence should be re-evaluated within a two-year period so that a more accurate estimation of his abilities can be made.*" (Italics in original, except for emphasis of last sentence.)

Dr. Gottsegen testified as a witness for plaintiff pursuant to a subpoena. He stated that he recommended CRMD placement because an *I.Q. of 75 was the cut-off point pursuant to State law* and because of "the general incapacities that seemed to be there." In discussing his difficulty in understanding plaintiff's speech, he testified:

"It was like listening to a radio at a very low level, with a lot of static. *You think you know what is being said, but you can't be that sure, and I think that comes through here, that I really wasn't sure and that's why we wanted him retested within two years.* This was always Bureau procedure.[3] We were always concerned in the B.C.G. not to make mistakes with kids and we were careful to see to it if we had doubts about what we were doing, that *we recommend that he be retested and say it, and that's what happened here.*" (Emphasis supplied.)

When asked whether his notation "slow in response" was due to plaintiff's speech or to "slow mentality", he answered that it was very hard to determine this, that "[a]ll we could note was the slowness of the response and make a judgment" and that "very frequently the issue that creates the retardation may have some subtle organic component, which also affects speech and could affect hearing and balance and various other characteristics". He also testified that *"[i]t was assumed that there was retardation* and there were also contributing factors. *How much was a pure retardation and how much was the result of contributing factors couldn't be known, at least by me * * * It was my feeling there was retardation, but I doubted some of the results and therefore I suggested a retesting.*" (Emphasis supplied.)

Despite his borderline finding of retardation and that "he doubted some of the results", he made no request to interview plaintiff's mother, or to learn whether plaintiff had been

---

3. This refers to the Bureau of Child Guidance (B.C.G.), where Dr. Gottsegen had been previously employed.

receiving treatment for his speech condition. Indeed, no attempt was made to obtain his social history and the mother was never told that the diagnosis of retardation was based on her son's falling short of the cut-off score of 75 by only one point or that, upon her request, the school authorities, *by their own rules,* would be required to retest the child. If they had informed her of her right to have her son retested, they might well have learned that he had achieved an I.Q. rating of 90 on the nonverbal Miller-Palmer Test given only 10 months earlier at the National Hospital for Speech Disorders.

Plaintiff's mother was called to plaintiff's school after the administration of the I.Q. test in January, 1957. She then spoke to someone in the Principal's office. She testified: "He told me they had a report from the Bureau of Child Guidance that my son was a Mongoloid child, and I asked him, I said, 'Well, what can I do?' and he says, 'Well, there are several things you can do. One, you can put him in an institution.' And I believe I asked him if that meant keeping him away from home and I told him I could never do that and then he says, 'The only thing, they could put him in special classes.' * * * He said they didn't have special classes in 81. I said, well, I would agree to it as long as he could stay home and I believe I left after that. I really couldn't tell you. I do know I started to walk and I walked and I walked home and I was crying, but it wasn't long after that that they transferred him to P.S. 11."

Because of plaintiff's CRMD placement, he was transferred to P.S. 11 on October 11, 1957 and remained there for two years. Thereafter he was transferred to P.S. 77 and then to P.S. 88; he remained in each school for two years; in September, 1963 he was transferred to P.S. 87, where he remained for one year; in September, 1964 he was transferred to P.S. 93, where he remained until the close of the 1967/1968 academic year. During all of this time, plaintiff resided at the same address. In September, 1968 he was transferred to the Queens Occupational Training Center (OTC). This is a manual and shop training school for retarded youths which provides no academic education. At the start of his second school year there (Sept., 1969) he was told that since it had been determined that he was not retarded he was not eligible to remain at the OTC.

In 1959 and 1960 (when plaintiff was respectively eight and nine years old) he received a "90 percentile" rating as to

reading readiness. This placed him in the top 10% of persons who were ready to learn how to read. Nevertheless, his reading achievements (based on standardized achievement tests given twice a year) were extremely low. Thus, at the age of 9, his reading level was 1.7 (i.e., less than second year level); when he was 10, the level dropped to 1.6, and it remained at that level when he was 11. His achievement tests in mathematics were somewhat higher, but still well below what would be expected of a child in a regular class. When he was 13½ years old, his reading level was 1.7 and his mathematics level was 2.6. However, as the expert witnesses on both sides agreed, *achievement* tests are not definitive tests of *intelligence.*

Defendant's explanation for not having plaintiff's intelligence retested (until he was 18) may be summarized as follows:

Up to 1968 it was not its practice to retest CRMD children unless requested by the child's parent or teacher. As to the latter, the achievement tests showed such dismal results that plaintiff's teachers always assumed that his I.Q. was no better than originally indicated. However, they apparently gave no consideration to the fact that his severe speech problem and the emotional fallout therefrom might have masked a higher intelligence than that indicated by the achievement tests.

As to plaintiff's mother not having requested a retesting, it must be iterated that she had not been told of plaintiff's boderline I.Q. or that defendant's rules gave her the unqualified right to demand a retest. She testified that when she took plaintiff to his first CRMD class (in October, 1957), this was what happened: "There were mothers there with their children and I asked if it was the special class and I was informed that it was. The children looked a little different, but I had no idea. Some of them wouldn't look up at you. They just kept their heads down. I remember one child his head—how shall I say it? He couldn't hold it straight. It just lulled around and his mother tried to help him. I inquired, 'My son is going to this class?' and I was told he was and I asked the teacher and she informed me that was a CRMD class and I said, well, I didn't know what that meant and I was again informed that it was for retarded children, and I said, 'You mean to say my son is retarded?' and she said, 'He must be, otherwise he wouldn't be in this class.' Now, I did inquire, I said, 'Will he be getting speech?' She said 'Yes, he'll get everything that is

needed here,' and I was very happy about that, and that's how it all started. He was in a retarded class and he stayed there."

On cross-examination of plaintiff's mother, defendant apparently attempted to show that she was to some degree responsible for the failure to have plaintiff retested. She admitted that she had never taken plaintiff to a psychiatrist or psychologist, but this was because she did not know "that there were doctors who treated children who had something wrong with their mind" and she had "never heard of psychiatrists * * * It never dawned on me. I was a foreigner unfortunately."[4]

Finally, On May 12, 1969, *after he had been closeted with mentally retarded children for more than 12 years,* plaintiff was administered an I.Q. test by Dr. William F. Garber of the Bureau of Child Guidance. At that time, plaintiff was one month past his 18th birthday and he was approaching the end of his first year at the Queens Occupational Training Center. Dr. Garber's report explains the reasons for administering that I.Q. test as follows: "Danny is being re-evaluted as to intellectual status, following an interview with his mother, who came to the school very much disturbed because her son has been rejected by Social Security for continuance of payments after the age of 18, the S.S.A. feeling he was not sufficiently handicapped by his retarded status to pursue gainful employment. On January 9, 1957, the Bureau of Child Guidance found a Binet I.Q. of 74."

Plaintiff was administered a Wechsler Intelligence Scale for Adults (W.A.I.S.) test. He scored a verbal I.Q. of 85 and a performance I.Q. of 107 resulting in a full scale I.Q. of 94.

The report of the test includes the following:

"He is a tall, well-built boy, alert looking and charming in manner, who is so incapacitated by a speech defect that communication is difficult for him. He relates very well, displays humor, and appears reality oriented.

*"On the W.A.I.S., he obtained a Verbal Scale I.Q. 85, Performance I.Q. 107, Full Scale I.Q. 94. This places him in the normal range.* However, his superior performance on tests of non-verbal intelligence as well as the fact that his extremely poor academic background, severely depreciated his scores on some verbal tests, make it very likely that *his intellectual potential is at least Bright Normal.*

---

4. Her education had stopped at the junior high school level. She had come to the United States from Germany when she was three years old.

*"Projective tests and tracings of geometric designs confirm the impression of good intelligence and contraindicate organicity.* He is however extremely compulsive, to a degree that sometimes reality testing suffers in his distribution of time for a task.

*"This boy has above average intellectual potential* and a good personality structure. Due to his being almost immobilized in the speech area, as well as considering his extremely defective academic ground, he would find it difficult, if not impossible, to function in a regular high school. Psychomotor coordination is good, however. Referral to [Division of Vocational Rehabilitation of the State Education Department] is suggested for specialized training and alleviation of the speech problem." (Emphasis supplied.)

Neither plaintiff nor his mother was advised of the test results at that time. Plaintiff remained at the Occupational Training Center until the end of the spring semester. He returned to the OTC on September 8, 1969. His mother testified as to the events of that day:

"Well, my son went to school as usual and then perhaps an hour, maybe an hour and a half later I get a phone call. My son is on the phone. He says, 'They threw me out of school,' and I yelled on the phone, 'What did you do wrong?' He says, 'I didn't do anything. They just said I don't belong here any more.' I said, 'Stay there, don't move, I'll be down.'

"Q. How did he sound?

"A. Very upset. I got in my car, drove down, and when I got there he was sitting on the stoop there. I said, 'C'mon inside.' He said, 'I can't go in there any more.' I said, 'Don't be silly, let's go.' I went inside to the principal's office, I believe it was. I spoke to Dr. Kurtzer and he told me from their tests they discovered he was not retarded and they could no longer keep him there because he doesn't qualify. So I wanted to know, 'What is he going to do now?' * * *

"Going home, all he kept saying, 'Where am I going to go now? I have no place to go.' That was his life. He got up in the morning. He got dressed, went to school and came home. That was his life. 'Where is he going to go now?' "

She then testified about plaintiff's activities in the following months:

"Well, when I was home—I was still working nights but when I was home he stayed in his room. He wouldn't come

out. He'd just close the door. We have a railroad apartment. So I would have to knock on the door to go through the other rooms.

"Q. What did you see with relation to what he was doing?

"A. He was just sitting in the corner brooding, crying what was he going to do, he wasn't a little child, he was a grown man."

In December, 1969, at the behest of plaintiff's counsel, plaintiff was examined by Dr. Lawrence I. Kaplan, a neurologist and psychiatrist. At that time plaintiff had been out of the school system for three months. Dr. Kaplan found that plaintiff had a marked stutter, that his articulation was not clear and that he had difficulty in making himself understood. On neurological testing he found him to be normal in all respects and he ruled out any brain damage. Dr. Kaplan elicited that plaintiff had been having symptoms of "being upset, shaking, unable to eat properly, crying, feeling depressed, not sleeping well, walking the floor, had no friends". His opinion was that plaintiff was not mentally retarded, but that he had a "defective self-image and feelings of inadequacy". This was because plaintiff had been placed in a class of mentally retarded children and "this result[ed] in an alteration in his concept of himself, particularly because he is intelligent enough to appreciate the position in which he is placed". Dr. Kaplan added: "If * * * [one] is treated as a mentally retarded patient, a person who cannot learn or cannot do something that normal children are doing, he assumes in the long run that that's the role that he should be playing in life and so this diminishes his incentive and diminishes the capacity to learn". He testified that plaintiff was still trainable and that he could be helped with special education and psycho-therapeutic support, but even that could not "correct all the damage of ten years or more of deprivation educationally and of characterization as a mentally retarded person". He continued that when one is told he is not retarded after 13 years of being considered otherwise, one cannot then simply go out and say, "Now I am not retarded. I am going to conquer the world or do something". Plaintiff's acceptance of his role as "retarded" was also understandable on the basis of his serious speech defect. Knowing that he could not speak as well as other children, his self-image was already deflated, making it more likely that he would accept the conclusion that he was retarded.

Dr. Kaplan referred plaintiff to Dr. Lawrence Abt, a clinical psychologist who, in January, 1970, administered several tests including the Wechsler. Adult Intelligence Scale. On the predominantly *verbal* part of that test he attained an I.Q. of 89; on the *performance* subtests he attained an I.Q. of 114. Combining the levels of these tests resulted in a full scale I.Q. of 100.[5] He explained that plaintiff's lower score on the verbal part of the test was largely influenced by his schooling. Dr. Abt concluded that plaintiff's learning potential had always been above average and that one of the reasons his intellectual development had been diminished was the assumption of the correctness of the school's diagnosis by his family and others, by reason of which they did not provide the stimulation that would otherwise have been given the child. The result was that, at the time Dr. Abt examined him, plaintiff felt that he was substantially without an education; that he did know what he could do to earn a living; and that he did not know "where he fitted into the world, and even where he fitted into his family". All this was a competent producing cause of the condition of depression that he noted in plaintiff.

Plaintiff had no additional schooling up to the time of the trial. In August, 1970, when he was 19 years old, he was interviewed by the State Division of Vocational Rehabilitation. Its records show that he was "outgoing, cheerful and desirous of the company of his peers. He misses the Queens Training Center. However, medical examination indicates that * * * [his] primary need is for speech training, since he is barely understandable. In addition to his handicap, his mother seems to have developed a deep need and a habit of doing all of * * * [his] communication for him; they have a warm relationship."

The Division of Vocational Rehabilitation provided a speech therapy program for him in the National Hospital for Speech Disorders. He was provided 40 weekly sessions of therapy and he showed slow improvement. In July, 1972, when he was 21 years old, he was referred by his rehabilitation counselor to Dr. Bernard Stillerman, who noted that plaintiff was "very

---

5. Plaintiff was also administered a Bender-Gestalt Test which showed no brain damage; a human figure drawing test which showed a sophisticated artistic ability and also indicated at least average intelligence, and a sentence completion test which showed that plaintiff was "in a rather depressed state, that he had a very poor self-image or conception of himself, and that his attitude towards his future was not favorable".

dependent on his mother who not only made the appointment for him but is his verbal contact, for the most part, with the world * * * He described himself as being mildly anxious, nervous and tense when he is with people and I assume this was related to his * * * speech. He is also moderately depressed because of the speech problem which precludes him from having friends. In fact, he is preoccupied with the thought that he can make friends but cannot keep them because of his speech."

Dr. Kaplan testified that when he saw plaintiff in 1975 (apparently in preparation for the trial) he had progressed in improving his speech, although he continued to have "persistent language problems, chiefly with some stammering and articulatory difficulties".

Plaintiff was trained by the Division of Vocational Rehabilitation to be a messenger and it obtained his first job for him. Thereafter he had 11 different messenger jobs. At the time of the trial he had a part-time job as a messenger, earning $50 per week for 20 hours of work. He testified that he did not like this work. A record of the division, dated June 20, 1973 (when plaintiff was 22 years old) states: "Recent Psychological testing indicates that the client is capable of performance at a much higher level than was previously determined. The test material indicates that [the] client is capable of training in a skilled mechanical area. His motivation for doing better is extremely high * * * He is unable at this time to relate to a specific vocational goal, and it is felt that a period of further evaluation would be appropriate prior to any lengthy training program."

At the age of 26 (as of the date of the trial) he had not made any advancement in his vocational life, nor any particular improvement in his social life.

AS TO DEFENDANT'S FAILURE TO FOLLOW THE RECOMMENDATION OF DR. GOTTSEGEN THAT PLAINTIFF'S "INTELLIGENCE SHOULD BE RE-EVALUATED WITHIN A TWO YEAR PERIOD SO THAT A MORE ACCURATE ESTIMATION OF HIS ABILITIES CAN BE MADE".

Defendant's principal argument for reversal is that Dr. Gottsegen's report of January 23, 1957 did not recommend that plaintiff be given another I.Q. test within two years, and that his testimony that it did was incredible as a matter of law and therefore could not act as a basis for the jury's verdict in favor of the plaintiff. Dr. Gottsegen testified that "we wanted him retested within two years" and that it was

his "feeling there was retardation" but that he "doubted some of the results and *therefore I suggested a retesting"* (emphasis supplied). He also testified that he had followed the procedure of the Bureau of Child Guidance and "if we had doubts about what we were doing, that we recommend that he be *retested* and say it, and that's what happened here." *At no time was he cross-examined as to the propriety of his conclusion that that was what he had recommended.* Defendant argues, nevertheless, and Mr. Justice MARTUSCELLO agrees, that Dr. Gottsegen's testimony cannot be given factual acceptance because, in his report, he used the words "should be *re-evaluated"* and not "should be *retested".* However, in so arguing, defendant entirely omits to note that the direction was that his "intelligence should be re-evaluated".

It is defendant's position that the words "retest" and "re-evaluate" are words of art with different meanings. "Retest", argues defendant, means to administer a further I.Q. test, while "re-evaluate" means observation of the child and noting his achievements as a basis for determining whether a new I.Q. test should be administered.

Defendant maintains that the continuous observation of plaintiff by his succeeding teachers, each of whom noted the scores on the semiannual achievement tests, amounted to "a *constant* re-evaluation, with Dr. Gottsegen's report not overriding their own observations." Defendant asserts that the record amply supported their judgments and, further, that if there was a difference of opinion as to this it was no more than an error of professional judgment not severe enough to constitute negligence.

Defendant's analysis flies in the face of the testimony of the expert witnesses on both sides to the effect that intelligence of children is determined in schools (and elsewhere) *only* by I.Q. testing, and that achievement tests and classroom evaluations do not determine the intelligence of a child.[6] Since Dr. Gottsegen's written recommendation was that plaintiff's *"intelligence* should be re-evaluated within a two year period", it

6. Thus, Dr. Donald Wiedis, a witness for defendant, who trained school psychologists for the board of education, testified that intelligence tests have nothing to do with what one has learned in the past and are not designed "to tap academic achievement." Also, Dr. Henry Lipton, who was employed by defendant as a manager of clinical psychology services for his school district, and who appeared as a witness for defendant, testified that although he did not know what Dr. Gottsegen's intent had been, the word "intelligence" would require an I.Q. evaluation (which, of course, could not be done without an I.Q. test).

could only mean that he was to be administered a new I.Q. test within that period. If it did not have that meaning, it meant nothing, since a CRMD child is always being observed by his teacher for signs of improvement,[7] and achievement tests were being given semiannually to *all* CRMD children. Actually, it would mean less than nothing for it would (absurdly) mean that (a) instead of the teachers observing him daily, they should do so only once in two years, and (b) instead of giving the required achievement tests twice a year, plaintiff (alone among all CRMDs) should be given such a test only once during the ensuing two years. Yet defendant argues, in effect, that such was the correct interpretation and that it is *incredible* to maintain otherwise.

If in fact Dr. Gottsegen's prescription was equivocal, or his recommendation that plaintiff's "intelligence should be re-evaluated" was puzzling or ambiguous, it was up to the school administration to find out what its own employee meant, for he was paid to give advice, not to intone as a Delphic oracle. In any event, an error due to his lack of clarity, if such there was, would be the responsibility of the board of education under the rule of *respondeat superior*.[8] Several of plaintiff's teachers were called by defendant and each stated that she must have noted Dr. Gottsegen's 1957 report that plaintiff's "intelligence should be re-evaluated" and that notwithstanding that direction no I.Q. tests were given to him at any time after 1957. Thus, plaintiff's teachers failed to follow the direction for a new *"intelligence"* analysis based solely on their observations that plaintiff was doing very poorly on his *"achievement"* tests. Certainly the very least that can be said is that the jury could properly have concluded that if Dr. Gottsegen's 1957 report was ambiguous, each teacher, and therefore the defendant as their employer, was negligent in failing to inquire as to its true meaning. Thus, the failure to follow Dr. Gottsegen's recommendation for an intelligence

---

7. Plaintiff's teachers testified that in a substantial number of cases they had recommended I.Q. retesting, on the basis of which some children were transferred to regular classes.

8. We now know (albeit with hindsight) that Dr. Gottsegen, although he had "given the benefit of the doubt [on his I.Q. testing of plaintiff] when it seemed reasonable to do so", had not given *enough* benefit, since it is now unquestioned that plaintiff's true I.Q. was never as low as 74. That Dr. Gottsegen was doubtful of the accuracy of his conclusion is made manifest by his ordering of a new analysis of plaintiff's intelligence "within a two year period so that a more accurate estimation of his abilities can be made."

retesting to determine so vital a matter as whether plaintiff should be continued in a class for retarded children was an egregious error committed on a wholesale basis.

It may be contended that plaintiff's poor results on his achievement tests, his speech and his appearance, might have misled even well-intentioned and devoted teachers, but the obvious answer is that while it was within the professional judgment of each of plaintiff's teachers as to when to *recommend* retesting (based on their own observations or on plaintiff's achievement test scores), *it was not within their province or discretion to prevent Dr. Gottsegen's recommendation from being carried out,* no matter what they might. have believed the result of such retesting would be.

Of course plaintiff's teachers could not have had the foresight to know that when plaintiff would reach the age of 18 his intelligence would be found to be well within the normal range. The indisputable fact remains (and defendant now concedes) that plaintiff's intelligence was *always* normal since one's intelligence does not leap from less than three-quarters of average (74) to average (100). While this was masked by plaintiff's massive problems, it should have made no difference to his teachers. If they were right, no more would have been lost than the time and expense of having the school psychologist administer a follow-up test to a child who had been originally classified as having an I.Q. only one point below that required for placement in a regular class.

Fortunately, since 1968 no such error is likely to occur for both New York State and the New York City Board of Education now require frequent and periodic intelligence retesting of children in CRMD classes. Obviously the liability of defendant cannot be based on this later standard. However, for the years following 1957 (and prior to 1968) there were three ways in which a student's intelligence could be retested: the first was by recommendation of his teachers (as it was for all CRMD children); the second was by request of the child's parents (as it was for all CRMD children); the third (and this applies specifically to plaintiff) was where the school psychologist recommended that this should be done.

On the facts in this record, we need not reach the question of whether plaintiff's teachers, on their own, should have recommended I.Q. testing or whether plaintiff's mother was remiss in not requesting it (or, and more to the point, whether defendant was remiss in not advising plaintiff's mother that

she had the right to make such a request, in which case it would be granted) since it is not necessary to go any further than to note that the school psychologist's recommendation was totally ignored. Only the test result showing an I.Q. of 74 (and apparently the erroneous references to "Mongolian tendencies" and "Mongoloid features") was acted upon; the rest might as well have been written in sand. The consequences of defendant's failure to follow its own psychologist's recommendation were predictable. So little had to be done to avoid the awesome and devastating effect of that on plaintiff's life, and that little was not done.

Citing *James v Board of Educ. of City of N. Y.* (42 NY2d 357), defendant argues and Mr. Justice MARTUSCELLO opines that the issue of whether it had a duty to periodically retest plaintiff's I.Q. should not have been submitted to the jury. Defendant argues that the *James* case holds that a jury should not be permitted to evaluate the merits of a plaintiff's disagreement with the educational assumptions relied upon by the board of education "and that questions regarding the board's exercise of judgment and discretion, and its allocation of available resources, are inappropriate for resolution in the courts." That interpretation, apparently also adopted by Mr. Justice DAMIANI, is a misapplication of the *James* case. There the Court of Appeals denied enjoinder of a decision of the board of education to proceed with tests in reading and mathematics throughout the entire New York City school system. Plaintiffs there claimed that the integrity of the tests had been compromised by the accidental premature distribution of sample materials to certain schools. The court merely held that it was for the board of education, and not the judiciary, to decide whether to cancel the tests, because (p 367) "[t]he court may not under the guise of enforcing a vague educational public policy, suggested to it," assume the powers vested in school officials. It therefore declined to review what it considered were (p 368) "questions of judgment, discretion, allocation of resources and priorities inappropriate for resolution in the judicial arena".

Defendant argues that the policy to retest only where requested by parents or where recommended by teachers also involved "judgment, discretion, allocation of resources and priorities". Defendant then posits that "[w]hat will not be done in a direct challenge * * * should even more clearly not

be done in the context of an individual's claim for civil damages."

Defendant's conclusion is a complete *non sequitur,* for the failure to retest plaintiff was not occasioned by a policy decision of the board as to "its allocation of available resources", but occurred solely because of the negligence of its employees in failing to follow its own determination as to this specific child.

Defendant's affirmative act in placing plaintiff in a CRMD class initially (when it should have known that a mistake could have devastating consequences) created a relationship between itself and plaintiff out of which arose a duty to take reasonable steps to ascertain whether (at least, in a borderline case) that placement was proper (see *Schuster v City of New York,* 5 NY2d 75; *Florence v Goldberg,* 44 NY2d 189). We need not here decide whether such duty would have required "intelligence" retesting (in view of plaintiff's poor showing on achievement tests) had not the direction for such retesting been placed in the very document which asserted that plaintiff was to be placed in a CRMD class. It ill-becomes the board of education to argue for the untouchability of its own policy and procedures when the gist of plaintiff's complaint is that the entity which did not follow them was the board itself.

■ New York State and its municipalities have long since surrendered immunity from suit. Just as well established is the rule that damages for psychological and emotional injury are recoverable even absent physical injury or contact *(Ferrara v Galluchio,* 5 NY2d 16; *Battalla v State of New York,* 10 NY2d 237). Had plaintiff been improperly diagnosed or treated by medical or psychological personnel in a municipal hospital, the municipality would be liable for the ensuing injuries. There is no reason for any different rule here because the personnel were employed by a government entity other than a hospital. Negligence is negligence, even if defendant and Mr. Justice DAMIANI prefer semantically to call it educational malpractice. Thus, defendant's rhetoric constructs a chamber of horrors by asserting that affirmance in this case would create a new theory of liability known as "educational malpractice" and that before doing so we must consider public policy (cf. *Riss v City of New York,* 22 NY2d 579; *Tobin v Grossman,* 24 NY2d 609; *Howard v Lecher,* 42 NY2d 109) and the effects of opening a vast new field which will further impoverish financially hard pressed municipalities. Defendant,

in effect, suggests that to avoid such horrors, educational entities must be insulated from the legal responsibilities and obligations common to all other governmental entities no matter how seriously a particular student may have been injured and, ironically, even though such injuries were caused by their own affirmative acts in failing to follow their own rules.

I see no reason for such a trade-off, on alleged policy grounds, which would warrant a denial of fair dealing to one who is injured by exempting a governmental agency from its responsibility for its *affirmative* torts. Such a determination would simply amount to the imposition of private value judgments over the legitimate interests and legal rights of those tortiously injured. That does not mean that the parents of the Johnnies who cannot read may flock to the courts and automatically obtain redress. Nor does it mean that the parents of all the Janies whose delicate egos were upset because they did not get the gold stars they deserved will obtain redress. If the door to "educational torts" for nonfeasance is to be opened (see 29 Syracuse L Rev 147-152; *Pierce v Board of Educ. of City of Chicago,* 44 Ill App 3d 324; *Peter W. v San Francisco Unified School Dist.,* 60 Cal App 3d 814; cf. *Donohue v Copiague Union Free School Dist.,* 64 AD2d 29), it will not be by this case which involves *misfeasance* in failing to follow the individualized and specific prescription of defendant's own certified psychologist, whose very decision it was in the first place, to place plaintiff in a class for retarded children, or in the initial making by him of an ambiguous report, if that be the fact.

As Professor David A. Diamond noted (29 Syracuse L Rev 103, 150-151), when discussing this very case after the judgment at Trial Term, and contrasting it with the *Donohue* case, upon which Mr. Justice DAMIANI lays so much stress, "the thrust of the plaintiff's case is not so much a failure to take steps to detect and correct a weakness in a student, that is, a failure to provide a positive program for a student, but rather, affirmative acts of negligence which imposed additional and crippling burdens upon a student" and that "it does not seem unreasonable to hold a school board liable for the type of behavior exhibited in *Hoffman.*" I agree.

### CONCLUSION

Looking at the facts in this record in a light most

favorable to the plaintiff, as we are required to do (see *Broderick v Cauldwell-Wingate Co.,* 301 NY 182, 185; *Faber v City of New York,* 213 NY 411, 414; *Matter of Foss v Conroy,* 38 AD2d 638, 639), a dismissal here as recommended by Mr. Justice MARTUSCELLO, would be "an intrusion on the jury's role as trier of the facts", and would constitute "an unwarranted finding of fact in a jury case" (see *Lane-The Real Estate Dept. Store v Lawlet Corp.,* 28 NY2d 36, 43; *Pekar v Tax,* 43 AD2d 957). This is particularly true when it is recalled that the test of the credibility of witnesses is best left to those who heard the live testimony—the triers of the facts *(Kelly v Watson Elevator Co.,* 309 NY 49, 51; *Amend v Hurley,* 293 NY 587, 594). Thus Mr. Justice MARTUSCELLO, in discounting Dr. Gottsegen's "testimony as a matter of law" because in his opinion the doctor's "credibility has been strongly impaired", has disregarded the well-settled rule that "in any case in which it can be said that the evidence is such that it would not be utterly irrational for a jury to reach the result it has determined upon, and thus a valid question of fact does exist, the court may not conclude that the verdict is as a matter of law not supported by the evidence" (see *Cohen v Hallmark Cards,* 45 NY2d 493).

Therefore, not only reason and justice, but the law as well, cry out for an affirmance of plaintiff's right to a recovery. Any other result would be a reproach to justice. In the words of the ancient Romans: *"Fiat justitia, ruat coelum"* (Let justice be done, though the heavens fall). However, the verdict should be reduced to $500,000.[9]

MARTUSCELLO, J. P. (dissenting). We are faced with the determination of a delicate issue—whether the plaintiff was deprived of an adequate and suitable education for the 12-year period between 1957 and 1969, by reason of the defendant's alleged negligent evaluation of his intelligence and its failure to retest his I.Q. during those years.

After careful scrutiny of the testimony, I conclude that the initial placement of the plaintiff in the educational system was made in a proper manner and that retesting by giving another I.Q. test was not indicated during the period in question. The plaintiff has failed to establish the defendant's negligence on any of the alleged theories of liability. I would,

---

9. The dissenters have authorized me to say that if they were not voting to reverse and dismiss plaintiff's complaint, they would join in the reduction of the verdict.

accordingly, reverse the judgment, on the law, direct a verdict in favor of the defendant and dismiss the complaint, without costs or disbursements.

Although the majority opinion sets forth a detailed statement of the facts, for the purpose of my dissent, I deem it necessary to reiterate a large portion of those facts, and to include additional ones.

The plaintiff, Danny Hoffman, has had a severe speech impediment throughout most of his life. In February, 1956, when the plaintiff was nearly five years old, his mother took him to the National Hospital for Speech Disorders. Its records noted that he had little or no intelligible speech and that he appeared to be retarded.

On March 5, 1956 the plaintiff's intelligence was tested at that hospital at his mother's request. He was given a Merrill-Palmer (nonverbal) intelligence test, upon which he attained an I.Q. score of 90. This was well within the range of normal intelligence. It was found that he could work well into the average and even brighter range. Plaintiff was then placed in the New York Speech Institute for weekly therapy. Such treatment continued until he was enrolled in his first special education class.

Plaintiff commenced his formal education in September, 1956 at the age of five and one-half years. At the recommendation of his teacher, who observed "Mongoloid tendencies", severe speech defects and slow responses, Danny's I.Q. was individually tested. In January, 1957 Dr. Monroe C. Gottsegen, a psychologist from the Board of Education's Bureau of Child Guidance, administered a Stanford-Binet (verbal) I.Q. test. In his report, dated January 23, 1957, Dr. Gottsegen concluded that the plaintiff was eligible for placement in a class for children with retarded mental development (CRMD) and stated that:

"Danny impresses as [sic] a shy, cooperative youngster. Mongoloid features are observable. *There is a marked speech defect which makes Danny hesitant in speaking up.* He obviously understands more than he is able to communicate. With careful listening, it is frequently possible to understand what he is driving at.

"On the Stanford-Binet, L, he achieves a mental age of 4-3 and an *I.Q. of 74,* indicating borderline intelligence. The obtained I.Q. may be higher than it ought to be as the

Examiner was confronted with the task of having to interpret what Danny was trying to say, *Danny being given the benefit of the doubt when it seemed reasonable to do so.*

"Danny is frequently bored in class and needs a specialized, individualized teaching program. At this point, a continued, yet varied readiness program should be offered him. He is not yet able to do formal learning. He needs help with his speech problem in order that he be able to learn to make himself understood. Also, his intelligence should be *re-evaluated within a two year period so that a more accurate estimation of his abilities can be made."* (Emphasis supplied.)

A CRMD class consists of a maximum of 18 students who have an I.Q. between 50 and 75. These children are considered to be capable of some degree of learning and are taught academic subjects such as reading and arithmetic in the earlier grades and additional subjects such a social studies and geography in the later grades.

Plaintiff attended CRMD classes in various schools for 11 years. During those years, he was taught, tested and observed by experienced teachers trained to work with retarded children. Danny's school records indicated that he was generally well behaved, pleasant, co-operative and well liked by his teachers. However, academically he performed unsatisfactorily in reading, mathematical concepts and oral communications.

Danny's I.Q. had never been retested at any point during his placement in CRMD classes. During that period, it was the policy of the board of education *not* to retest a CRMD student unless such retesting was recommended by the student's teachers or requested by the parents. None of the plaintiff's teachers or his mother requested a retesting during this period. Nevertheless, the plaintiff was given standardized achievement tests semiannually in reading and mathematics similar to those tests given to students in regular classes. The results of such tests were discouraging. The plaintiff's grades and his corresponding chronological age at the time, were as follows:

| DATE | CHRONOLOGICAL AGE AT TIME OF TEST | READING GRADE | MATH GRADE |
|------|-----------------------------------|---------------|------------|
| 1961 | 10 yrs, 6 mos | 1.6 | 1.7 |
| 1962 | 11 yrs, 6 mos | 1.6 | 2.3 |
| 1963 | 12 yrs, 6 mos | 1.6 | 2.2 |
| 1964 | 13 yrs, 5 mos | 1.7 | 2.6 |
| 1965 | 14 yrs, 6 mos | 1.9 | 3.7 |
| 1967 | 16 yrs | 2.8 | 4.0 |

In September, 1968 the plaintiff was transferred to the Queens Occupational Training Center, a manual and shop training school for retarded youths. Thereafter, on May 12, 1969, at his mother's request, the plaintiff was administered an intelligence test known as the Wechsler intelligence scale for adults by Dr. William F. Garber of the Bureau of Child Guidance. Danny, then 18 years of age, scored a verbal I.Q. of 85 and a performance I.Q. of 107, giving him a full scale I.Q. score of 94. The report of Dr. Garber recommended that the plaintiff return to regular classes. The doctor recorded the following findings:

"Danny is being reevaluated as to intellectual status, following an interview with his mother, who came to the school very much disturbed because her son has been rejected by Social Security for continuance of payments after the age of 18, the S.S.A. feeling he was not sufficiently handicapped by his retarded status to pursue gainful employment. On January 9, 1957, the Bureau of Child Guidance found a Binet I.Q. of 74.

"He is a tall, well-built boy, alert looking and charming in manner, who is so incapacitated by a speech defect that communication is difficult for him. He relates very well, displays humor, and appears reality oriented. * * *

"This boy has above average intellectual potential and a good personality structure. Due to his being almost immobilized in the speech area, as well as considering his extremely defective academic background, he would find it difficult, if not impossible, to function in a regular high school. Psychomotor coordination is good however. Referral to [Division of Vocational Rehabilitation of the State Education Department] is suggested for specialized training and alleviation of the speech problem."

Based upon Dr. Garber's findings and recommendation, Danny was terminated from the Occupational Training Center in September, 1969, at the commencement of his second year. The plaintiff was advised that he could not continue at the center because the results of the May, 1969 I.Q. test indicated that he was not sufficiently handicapped by his retarded status to preclude his obtaining gainful employment.

Thereafter, plaintiff commenced this action to recover damages for the injuries which resulted from his placement in CRMD classes. The complaint alleges two theories of liability:

(1) the defendant was negligent in its original testing procedures and placement of the plaintiff, causing or permitting him to be placed in an educational environment for mental defectives and mentally retarded children and consequently depriving him of adequate speech therapy which would have improved his only real handicap, a speech impediment; and (2) the defendant was negligent in failing or refusing to follow adequate procedures for the recommended retesting of the plaintiff's I.Q.

The defendant took the position that the plaintiff's score of 74 on the Stanford-Binet I.Q. test indicated that the plaintiff's placement in a CRMD class was proper. The defendant contends that the test was proper and administered by a competent and experienced psychologist. The defendant further alleges that it was the unanimous professional judgment of plaintiff's teachers, based upon their evaluation and the plaintiff's performance on his standardized achievement tests, that a retest of the plaintiff was not warranted. The board makes clear that it was its policy to retest only where recommended by the teachers or requested by the parents.

The two theories of liability as pleaded in the complaint were submitted to the jury. The jury returned a general verdict in favor of the plaintiff awarding him damages of $750,000. On this appeal the defendant challenges, *inter alia,* each theory of liability on the ground that the plaintiff failed to sustain his burden of proving his claim as a matter of law and therefore neither theory of liability should have been submitted to the jury.

I find merit in the defendant's position. It is conceivable that a case of educational malpractice may be pleaded and established against a board of education for an act of misfeasance. However, the plaintiff in the instant case has failed to establish the negligence of the defendant by its breach of a duty owed to the plaintiff under either theory of liability. Therefore, the plaintiff's complaint should have been dismissed at the close of the entire case.

Taking each theory of liability in turn, it is apparent that the evdience does not support the plaintiff's position. In support of the first theory, the plaintiff attempted to establish, by a series of inferences, that Dr. Gottsegen's administration of the Stanford-Binet verbal I.Q. test in 1957 was improper.

The thrust of plaintiff's evidence on this issue was that on account of plaintiff's severe speech disability, Dr. Gottsegen

should not have administered a Stanford-Binet test, which relies heavily upon verbal responses. However, plaintiff's own witness, Dr. Lawrence Abt, a clinical psychologist, testified that the Stanford-Binet test was one of the tests that might have been used and declined to testify that Dr. Gottsegen's failure to administer a performance test had been a departure from good psychological practice. None of plaintiff's expert witnesses testified that Dr. Gottsegen had departed from good psychological practice by administering a Stanford-Binet test. Defendant's witness, Dr. Henry Lipton, a clinical psychologist, testified that the Stanford-Binet test would certainly have been the preferred test for a child six years old. In fact, other witnesses testified that the 1957 test record indicated that Dr. Gottsegen had taken plaintiff's speech disability into account and had compensated therefor in interpreting the results of the test. Although Dr. Abt stated that it would have been wise for Dr. Gottsegen to supplement the verbal I.Q. test with the nonverbal I.Q. test, we cannot infer from this that it was unwise not to supplement it. Nor can we infer that there was a deviation from accepted or standard psychological practice not to do so.

Moreover, we cannot utilize the 1956 intelligence test administered by the National Hospital for Speech Disorders and the 1969 intelligence test administered by Dr. Garber to draw a circumstantial inference that Dr. Gottsegen had negligently administered or interpreted the 1957 Stanford-Binet test. Dr. Abt testified on direct examination that a child with an average intelligence might obtain an I.Q. score of 74 or less if he did not take the test seriously or if the test had been administered incorrectly, or if the test results had been incorrectly interpreted. Thus, the inference drawn by Dr. Abt was as consistent with the absence of liability as it was with liability. Where inferences are clearly equally consistent, the one with liability and the other with no cause of action, the plaintiff has not met the burden which the law has placed upon him (Ford v McAdoo, 231 NY 155, 162).

Under the circumstances, I am of the opinion that, upon all of the evidence, plaintiff did not prove that Dr. Gottsegen had negligently administered or interpreted the Stanford-Binet test. Accordingly, this issue should not have been submitted to the jury and the complaint should have been dismissed at the close of the entire case.

The plaintiff's second theory of liability is essentially built

on Dr. Gottsegen's testimony at the trial that he recommended a retesting. He stated that:

"I was able to communicate with him, but I wasn't sure about what I was doing because the communication was coming out very muddy. It was like listening to a radio at a very low level, with a lot of static. You think you know what is being said, but you can't be that sure, and I think that comes through here, that I really wasn't sure and that's why we wanted him retested within two years. This was always Bureau procedure. We were always concerned in the B.C.G. not to make mistakes with kids and we were careful to see to it if we had doubts about what we were doing, that we recommend that he be retested and say it, and that's what happened here. * * *

"It was my feeling there was retardation, but I doubted some of the results and therefore I suggested a retesting."

In his opinion Mr. Justice SHAPIRO observes that: "Since Dr. Gottsegen's written recommendation was that plaintiff's '*intelligence* should be re-evaluated within a two year period' it could only mean that he was to be administered a new I.Q. test within that period. If it did not have that meaning, it meant nothing, since a CRMD child is always being observed by his teacher for signs of improvement, and achievement tests were being given semiannually to *all* CRMD children."

However, after a study of Dr. Gottsegen's entire testimony, and a comparison of its contents with the testimony of the plaintiff's teachers, I have come to discount his testimony entirely. First of all, Dr. Gottsegen's testimony at the trial that he recommended a "retesting" of the plaintiff, was totally inconsistent with his written report, recorded 18 years earlier, that the plaintiff be "re-evaluated". Dr. Gottsegen's explanation at the trial, that he intended or meant by the directive "re-evaluate" that the plaintiff be in fact "retested", is not persuasive. The doctor communicated the word "re-evaluate". "Re-evaluate" is a term of art that has a specific connotation. Therefore the defendant must be judged in the context of its compliance with the recommendation that was made and not with a recommendation that was possibly intended in retrospect.

It is very clear from the record that prior to 1968, retesting was not the policy of the board of education unless such retesting was requested by the student's teacher or parents. Dr. Gottsegen's testimony that he believed that retesting was

the policy is irrelevant. His short association as an employee of the board of education could well explain his unfamiliarity with the board's policy. He was employed by the board for only the short week before he administered the test to the plaintiff and he left the board's employ the following year, in September, 1958.

At the trial, Dr. Gottsegen could not recall the nature of Danny's severe speech defect, which was markedly clear at the time of the examination, as the doctor noted in his report. This is a further indication of the witness' inability to recall the circumstances of the testing and examination. Not that Danny's isolated case should have, as a matter of course, stood out in Dr. Gottsegen's mind, among the thousands of tests administered and evaluated by him during the 18 years that intervened between Danny's 1957 tests and the trial.

The disparities between Dr. Gottsegen's written report and his in-court testimony, together with his limited association with the defendant, leads us to conclude that his credibility has been strongly impaired. I have therefore discounted his testimony as a matter of law.

With the removal of Dr. Gottsegen's testimony the plaintiff's case collapses. In its void the defendant developed a justification for its failure to retest the plaintiff's I.Q.

Miss Madeline Dalton was employed by the board of education for 35 years, first as a teacher of retarded children, later as a supervisor and, since 1968, as Director of the Bureau of Children with Retarded Mental Development. She explained that during the period in question there were generally 13,000 to 14,000 CRMD pupils in the system. Each year the I.Q. of approximately 500 of these pupils was formally retested. The remaining pupils were being re-evaluated each year as to their "functional level" to determine whether a retest of their I.Q. was warranted, on the basis of performance in class *and* on standardized achievement tests. Of the 500 retested each year about 125, or one fourth, were returned to regular classes. Miss Dalton testified that in the plaintiff's case not one of his teachers ever recommended a retest of his I.Q. or considered it advisable that he be placed in a regular class. Nothing in Danny's record indicated to her that he could have functioned in a normal class.

The defendant's witnesses distinguished between the terms "retest" and "re-evaluate". Miss Dalton explained that while the plaintiff was in attendance in the CRMD classes, the term

"re-evaluate" meant the administration of semiannual achievement tests. A retesting would involve the administration of a new I.Q. test. If a CRMD student demonstrated, upon re-evaluation by his performance on the semiannual achievement tests, that he was able to function beyond his expectancy level, he was then administered a new I.Q. test.

Dr. Donald Wiedis, a professor and licensed supervisor of school psychology, who trained school psychologists for the board of education, confirmed, the distinction between "re-evaluate" and "retest". He explained that "re-evaluate" means merely "taking another look" at the child's record to discern whether there was a perceivable jump in scores on a series of achievement tests. The term did not necessarily imply a formal retest of the subject child's I.Q. The only conclusion that can be drawn from the defendant's evidence, is that the term "re-evaluate" was a term of art with a precise meaning. The plaintiff never rebutted this conclusion.

It has been established that the pre-1968 policy of the board of education was to re-evaluate CRMD students. This policy itself has not been challenged by the plaintiff at any time. Miss Dalton, who conceded that a policy of periodic retesting of a child's I.Q. would have been preferable to a policy of testing only upon a teacher's recommendation or parent's request, testified nevertheless that she did not regard the board policy to have been improper at that time.

I have examined the record for evidence establishing that the plaintiff had in fact *been* re-evaluated according to the then existing policy. I find that he was regularly re-evaluated. The plaintiff was given standard achievement tests in mathematics and reading for the years 1960 through 1967, inclusive. Dr. Lipton testified that although an achievement test is not the equivalent of an I.Q. test, he believed that such test demonstrates a child's academic performance. Where the child does not "stand out" from his classmates, based on these tests, then it is consistent with the decision that he has been appropriately placed.

I have examined the plaintiff's academic progress as indicated by his tests *and* his teachers' observations and find that there was no reasonable basis for any teacher to recommend that he be retested. The achievement tests showed such dismal results that it was reasonable for plaintiff's teachers to infer that his I.Q. was no better than had been originally indicated. In 1967 his achievement tests in reading and math-

ematics indicated that plaintiff read at a level below the third grade and that he had the mathematical understanding of a fourth grade level. Had he been an average student in 1967, the plaintiff's reading and mathematics levels would have been at tenth or eleventh grade. Of all the achievement tests the plaintiff had been given since 1960, his 1967 scores were the highest he had ever obtained.

Mrs. Sally Stewart taught the plaintiff for two years, starting in 1964, in the subject area of reading, arithmetic, social studies and speech. It was her opinion that the plaintiff was working to his full potential. In her judgment he could not have functioned in a regular class of eighth graders for which a normal child of his chronological age would have been suited. She rested her judgment not only on his scores on standardized achievement tests, but upon her daily observations of his work in class and his performance on daily and weekly tests.

Although she testified on cross-examination that she recommended that Danny's I.Q. be rechecked, she made this statement in the context of a generality. At this point there may have been confusion in her mind with regard to the post-1968 board of education policy of retesting CRMD students every two years. This would be consistent with her later testimony elicited on redirect examination by the board of education.

"Q Did Danny ever overcome anything in your class?

"A No, sir.

"Q Did you ever feel while Danny was in your class that he should be re-evaluated?

"A No, sir.

"Q In your opinion did he reach his level?

"A Yes, sir. * * *

"Q And did * * * [Danny] at any time in your opinion warrant being retested for his IQ?

"A No, sir."

Mrs. Stewart testified that plaintiff's performance on achievement tests was consistent with a determination that he was retarded. Significantly, she testified that certain other students in the same class as plaintiff had improved their school work in the CRMD class. Upon the basis of such improvement they had been placed in classes for children of average intelligence. This indicates that some students overcame the stigma of being labeled retarded.

Mrs. Vicari taught the plaintiff in Junior High School 93 between the years 1964 to 1967. She indicated that when a child in her class was working up to potential or had significantly improved during the year, she would request a further re-evaluation of his I.Q. However, she did not believe that the plaintiff could have functioned in a regular class.

Accordingly, the sole conclusion which could be drawn from the evidence at the trial was that plaintiff's intelligence was in fact, periodically "re-evaluated". This "re-evaluation" referred to the child's entire school record, which consisted of teachers' observations of him in class over several years and the results of standardized achievement tests.

The issue of whether the board of education had a duty to periodically retest plaintiff's I.Q. should not have been submitted to the jury. As I interpret the Court of Appeals' recent decision in *James v Board of Educ. of City of N. Y.* (42 NY2d 357, 367), a jury should not be permitted to evaluate the merits of a plaintiff's disagreement with the educational assumptions relied upon by a board of education. Questions regarding a board's exercise of judgment and discretion, and its allocation of available resources, are inappropriate for resolution in the courts *(id.,* p 368). Under the guise of enforcing a vague educational public policy, a jury should not be permitted to assume the exercise of an educational policy that is vested by constitution and by statute in school administrative agencies *(id.,* p 367).

On the evidence presented by the plaintiff, I cannot justify any recovery on his behalf. The record discloses no impropriety in Danny's initial placement in a CRMD class and the evidence, absent Dr. Gottsegen's incredible testimony, weighs conclusively in favor of the board of education's position that "retesting" was neither recommended nor appropriate in Danny's case. Accordingly, the judgment should be reversed and the complaint against the board of education dismissed.

DAMIANI, J. (dissenting). In my view the judment in favor of the plaintiff in this case should be reversed and the complaint dismissed because it is the public policy of this State that no cause of action exists to recover for so-called educational malpractice *(Donohue v Copiague Union Free School Dist.,* 64 AD2d 29).

In the *Donohue* case, this court decided that the strong public policy of this State was to avoid judicial interference in

educational matters and that the recognition of a cause of action sounding in negligence to recover for so-called "educational malpractice" would impermissibly require the courts to oversee and, with hindsight, to evaluate the professional judgment of those charged with the responsibility for the administration of public education. As was predicted in *Donohue*, this case has involved the courts in an evaluation of judgments and actions of educators. In addition, the jury here was required to decide, among other issues "whether certain tests should have been administered or test results interpreted in one way rather than another" (64 AD2d, at p 35). The result was a trial transcript of some 2,036 pages, wherein the parties explored every facet of the plaintiff's education. Questions as to the propriety of educational judgments and actions are inappropriate for resolution in the judicial arena *(James v Board of Educ.,* 42 NY2d 357).

The majority opinion contains a forceful denunciation of the "injury" allegedly done to plaintiff by the defendant, but overlooks what is readily apparent from its own statement of the facts, namely that plaintiff suffered from a severe speech disorder in early childhood before he ever attended one of the defendant's schools, that his other learning problems flowed from his inability to communicate effectively and that his speech was at least no worse when he completed his course of instruction than when it began. In *Donohue (supra,* p 37), this court held that "the failure of educational achievement cannot be characterized as an 'injury' within the meaning of tort law". The purpose of the public schools is to confer the benefit of an education upon what would otherwise be an uneducated public. The failure to reach educational objectives with respect to a particular student does not result in an "injury" since the student commenced his education lacking knowledge, education, experience and, in this case, proper speech patterns. Hence, the failure to teach him how to speak properly has left him no worse off than when his schooling started.

The benefit of retrospection has enabled the plaintiff to convince a jury and the majority of this court that the defendant wrongfully placed him in a class for the mentally retarded and that he was severely damaged thereby. However, the record is clear that during the time he was in a CRMD *class* no protest against that placement was ever lodged by plaintiff or his mother and that throughout his schooling the plaintiff received the best speech therapy program that the

defendant offered to any pupil. He received instruction in social studies, mathematics, English and science and he is now able to read and write. Moreover, those of his teachers who were called to testify all gave their opinion that plaintiff would not have been able to function in a regular class. Thus, the total picture is not as dire as the one painted in the majority opinion. The defendant in this case may have failed to remedy plaintiff's speech problems, but it did not cause or aggravate them.

The majority seeks to distinguish the *Donohue* case upon the ground that it involved "nonfeasance" whereas this case involves "misfeasance". Quite apart from the fact that the complaints in both cases allege acts both of omission and commission, the main thrust of the plaintiff's case at bar was that the defendant failed to retest plaintiff within two years after his placement in a CRMD class as recommended by its own psychologist. This act of omission is one of nonfeasance, which is defined as the failure to perform an act which a person should perform (65 CJS, Negligence, § 2 [6], p 470; Black's Law Dictionary [4th ed], p 1208; see Prosser, Torts [4th ed], § 56). In *Donohue,* the gist of the plaintiff's cause of action was that although the defendant had given him instruction in reading, it had not done so properly or effectively and therefore he could not read upon graduation. This was an act of commission or misfeasance, which is defined as the improper performance of a lawful act (Black's Law Dictionary, *supra,* p 1151).

Even if the majority had assigned the alleged misfeasance and nonfeasance to the proper case, the distinction it seeks to draw is immaterial. Negligence exists when injury results from the violation of a legal duty that one owes to another, whether the act in violation be active or passive, of commission or omission, of misfeasance or nonfeasance (see 65 CJS, Negligence, § 2 [6], p 471; *Indiana Harbor Belt R. R. Co. v Jones,* 220 Ind 139; *Taylor v Northern States Power Co.,* 196 Minn 22; *Hoeverman v Feldman,* 220 Wis 557; see, also, *Mazloum v New York, New Haven & Hartford R. R.,* 115 NYS2d 238). The essential questions are whether a duty exists and whether it was breached, not whether the defendant's conduct in breaching the duty was active or passive. *Donohue* holds squarely that no such duty exists.

In my view, the result reached by the majority in this case arises from its implicit disagreement with the holding in

*Donohue.* As above demonstrated, the grounds upon which the majority seeks to distinguish *Donohue* are legally unsound and, therefore, on established principles of *stare decisis* the judgment appealed from should be reversed and the complaint dismissed. The failure of the court to follow its own obviously controlling recent decision can lead only to uncertainty and a lack of stability in the law (see 1 Carmody-Wait 2d, NY Prac, § 2:50 *et seq.*).

COHALAN and O'CONNOR, JJ., concur in the opinion of SHAPIRO, J.; MARTUSCELLO, J. P., and DAMIANI, J., dissent and vote to reverse the judgment and dismiss the complaint, with separate opinions.

Judgment of the Supreme Court, Queens County entered November 3, 1976, reversed, on the law, and new trial granted with respect to the issue of damages only, with costs to abide the event, unless, within 20 days after entry of the order to be made hereon, plaintiff shall serve and file in the office of the clerk of the trial court, a written stipulation consenting to reduce the verdict in his favor to $500,000, and to the entry of an amended judgment accordingly, in which event the judgment, as so reduced and amended, is affirmed, without costs or disbursements.